[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-789

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

BENNETT ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

OHIO ORGANIZING COLLABORATIVE ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-789.]

*Redistricting—Original actions under Ohio Constitution, Article XI—The Ohio Redistricting Commission's second revised plan violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution—Second revised plan is invalid—The Ohio Redistricting Commission shall be reconstituted, convene, and adopt an entirely new plan in conformity with the Ohio Constitution.*

(Nos. 2021-1193, 2021-1198, and 2021-1210—Submitted March 9, 2022— Decided March 16, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XI, Section 9.

_____

**Per Curiam.**

## I. INTRODUCTION

{¶ 1} This is now the third time we are called upon to consider the validity of a General Assembly–district plan adopted by respondent Ohio Redistricting Commission. In *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 2 ("*League I*"), we held that the commission's original plan was invalid because the commission had not attempted to meet the standards set forth in Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. The commission then adopted a revised plan, but in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 67-68 ("*League II*"), we invalidated that plan because the commission again had not satisfied Sections 6(A) and 6(B). We now consider petitioners'[1] objections to the commission's second revised plan, which the commission adopted on February 24, 2022.

{¶ 2} We hold that petitioners have shown beyond a reasonable doubt that the second revised plan violates Article XI, Sections 6(A) and 6(B). We do not reach the additional argument raised by some of the petitioners that the commission violated Article XI, Section 1(C). We again order the commission to be reconstituted and to adopt a new plan in conformity with the Ohio Constitution.

## II. BACKGROUND

### A. The commission failed to adopt a new plan by February 17

{¶ 3} In *League II*, we ordered the commission to adopt a new district plan no later than February 17, 2022. *League II* at ¶ 68. On February 9—two days after the release of *League II*—respondent Senator Vernon Sykes, a Democratic member and cochair of the commission, sent respondent Speaker of the House Robert Cupp, a Republican member and the other cochair, a letter requesting that the commission

---

1. Petitioners in case No. 2021-1193 are the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and six individual voters: Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, and Bonnie Bishop. Petitioners in case No. 2021-1198 are ten individual voters: Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty. Petitioners in case No. 2021-1210 are the Ohio Organizing Collaborative, the Ohio chapter of the Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters: Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

reconvene as soon as possible. Senator Sykes noted that this court had "directed the *Commission* to attempt to draw district plans" and that "[i]n order to do so, the *Commission*, rather than individual Commissioners, must meet and give direction to our staff and consultants." (Emphasis sic.) Senator Sykes also pointed out that in January 2022, he and the only other Democratic member of the commission, respondent House Minority Leader Allison Russo, had proposed their own General Assembly–district plan (the "Sykes-Russo plan"), which he believed could be used as a starting point for the commission's deliberations.[2] Senator Sykes claims that in response to his letter, House Speaker Cupp indicated that he was having difficulty scheduling a commission meeting due to the limited availability of the Republican commission members.

{¶ 4} On February 11, Senator Sykes and House Minority Leader Russo sent a letter to all commission members urging them to meet as soon as possible to comply with the February 17 deadline. They also noted that they were awaiting feedback on the Sykes-Russo plan, and they asked other commission members to share any map proposals so that the commission could "work cooperatively."

{¶ 5} On February 15—eight days after the release of *League II*—the commission announced that it would hold a meeting on February 17. Also on February 15, counsel for the petitioners in *League of Women Voters of Ohio v. Ohio Redistricting Comm.* and in *Bennett v. Ohio Redistricting Comm.* submitted to the commission an updated version of a proposed General Assembly–district plan created by Dr. Jonathan Rodden (the "Rodden III plan").[3]

---

2. Some parties refer to the Sykes-Russo plan as the "Glassburn Plan." Chris Glassburn is a consultant retained by the Democratic legislative caucuses for map-drawing purposes.

3. As noted in *League I*, Dr. Rodden is a professor of political science at Stanford University and an expert retained by the *Bennett* petitioners. In October 2021, Dr. Rodden submitted an expert report in which he claimed that he had drafted a district plan that complied with the line-drawing requirements of Article XI, Section 3 of the Ohio Constitution. Respondents did not contest those assertions. In *League I*, we suggested that Dr. Rodden's plan "complied with Article XI." *Id.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 126. But Dr. Rodden later discovered that his plan included splits that were impermissible under Section 3. During the first redrawing process, Dr. Rodden submitted a revised version of his plan, referred to as the "Rodden II" plan, in which he had purportedly corrected the violations. *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 14, fn. 5, and ¶ 32, fn. 8. The commission argued that the Rodden II plan also violated Section 3. The *Bennett* petitioners did not agree. Nevertheless, during the second map-redrawing process, Dr. Rodden

{¶ 6} At the start of the commission's February 17 meeting, House Minority Leader Russo said that except for one email from respondent Auditor of State Keith Faber's office, she and Senator Sykes had not received feedback about the Sykes-Russo plan. When House Minority Leader Russo moved the commission to adopt the Sykes-Russo plan, respondent President of the Senate Matthew Huffman—with the assistance of prepared posters and visual aids—asked her a series of questions indicating that he believed that the plan was unconstitutional. He suggested that the Sykes-Russo plan violated Article XI, Section 6(A)—which requires that no plan be drawn primarily to favor a political party—because a number of Republican incumbents would be unable to seek reelection under it, since they were either drawn into the same district as other Republicans or drawn into Democratic-leaning districts. He also said that several districts were not compact and that the plan would be struck down in federal court as a racial gerrymander.[4]

{¶ 7} At one point during Senate President Huffman's comments, Senator Sykes stated again that neither he nor House Minority Leader Russo had received substantive feedback about their proposed Sykes-Russo plan before the meeting. Senator Sykes reminded the other members that this court had directed the commission—not the majority or minority parties—to draw a map and that the commission members would need to work together to comply with the court's order. Senate President Huffman responded by saying that in September 2021,

---

submitted a third proposed plan—the "Rodden III" plan. The *Bennett* and *League* petitioners indicated that Dr. Rodden had made minor, technical adjustments to the plan to avoid any disputes about the plan's compliance with Section 3.

4. Senate President Huffman also suggested that this court had introduced a "new concept [of] partisan symmetry" in *League II*. In fact, we relied on a partisan-symmetry analysis in both *League I* and *League II*. *See League I* at ¶ 122; *League II* at ¶ 41-42. Senate President Huffman—at commission meetings and in his response to petitioners' objections—appears to conflate "partisan symmetry" with our analysis in *League II* in which we explained why the first revised plan's disproportionate number of toss-up districts leaning Democratic was evidence of an intent to favor the Republican Party. *See League II* at ¶ 40. For the sake of clarity, "partisan symmetry" is a metric used by political scientists to measure partisanship in redistricting. It "measures whether each party would receive the same share of legislative seats assuming that each had identical percentage vote shares." *League I* at ¶ 122. In *League II*, we relied on Dr. Michael Latner's partisan-symmetry analysis as evidence of a Section 6(A) violation. *League II* at ¶ 41-42. We also relied on a *different* factor as evidence of a Section 6(A) violation—the first revised plan's inclusion of a disproportionate number of Democratic-leaning toss-up districts. *Id.* at ¶ 40. The two concepts are different.

during the first map-drawing process, he spent three days trying to reach a resolution with Senator Sykes and other commission members but "that didn't happen" and that he now was focused only on the map that was currently before the commission.

{¶ 8} The commission voted five to two against adopting the Sykes-Russo plan. No other commission member proposed a General Assembly–district plan for consideration at the February 17 meeting. Instead, after a recess, several commission members made statements. Senate President Huffman suggested that it was impossible to draw an entirely new plan within ten days as ordered by this court and that he did not believe the commission could "ascertain" a General Assembly–district plan that complies with the Ohio Constitution, as interpreted by this court, and with federal law. Respondent Secretary of State Frank LaRose said that the map drawers—Ray DiRossi and Blake Springhetti, who Secretary LaRose noted, "work for the speaker and for the president"—told him that the commission cannot "constitutionally do what the court majority has asked [the commission] to do." Respondent Governor Mike DeWine said that the commission did not have the "luxury of saying we're just quitting" and that it had an obligation to attempt to comply with the court's order "and to send a map to the court." House Speaker Cupp declared that the commission was "in an impasse."

{¶ 9} The commission adjourned its February 17 meeting without adopting a General Assembly–district plan. The commission did not specify the steps it had taken to attempt to comply with this court's order. The next day, the commission filed in this court a "Notice of Impasse."

### B. Respondents are ordered to show cause

{¶ 10} On February 18, petitioners filed motions to require respondents either to explain their reasons for failing to adopt a new General Assembly–district plan or to show cause why they should not be held in contempt. Later that day, this court ordered respondents to show cause by February 23 why they should not be held in contempt for failing to comply with our order in *League II*. 166 Ohio St.3d 1402, 2022-Ohio-498, ___ N.E.3d ___; 166 Ohio St.3d 1403, 2022-Ohio-498, ___ N.E.3d ___.

{¶ 11} On February 22, the commission met to discuss congressional redistricting. At that meeting, Governor DeWine reiterated his position that the commission had an obligation to follow this court's orders regarding General Assembly redistricting. Auditor Faber suggested that the commission schedule a meeting within the next two days to discuss a General Assembly–district plan that "may be being discussed and/or prepared" or to discuss, in the alternative, the Rodden III plan. House Speaker Cupp agreed to schedule a meeting for the next day to "report on any progress that may be made on a General Assembly district map." House Minority Leader Russo said that she and Senator Sykes had not been included in any discussions regarding a potential General Assembly–district plan, and she requested that other commission members' staff include the minority members in those discussions.

{¶ 12} On February 23, respondents filed five separate responses to the show-cause order. Senate President Huffman and House Speaker Cupp argued that a contempt hearing was unnecessary because they anticipated that the commission would vote on a new plan "this week." At the commission's meeting later that day, House Speaker Cupp reported that "progress [was] being made" on a proposed General Assembly–district plan and that the map would be made available soon. House Minority Leader Russo again requested that if work was being done on a map "that the majority caucuses please make their staff available" to the minority members and their staff so that they could "meet to discuss what these maps may look like."

**C. The commission adopts a second revised plan on February 24**

{¶ 13} On February 24, respondents were ordered to appear in this court for a March 1 hearing on the show-cause order. 166 Ohio St.3d 1407, 2022-Ohio-518, ___ N.E.3d ___. According to House Minority Leader Russo, also on February 24, House Speaker Cupp informed her and Senator Sykes that DiRossi and Springhetti could meet with them to show them the new proposed General Assembly–district plan. House Minority Leader Russo states that during the meeting with DiRossi and Springhetti, she and Senator Sykes asked whether they would have an

opportunity to provide feedback on the proposed plan, and DiRossi responded that such decisions were "above his pay grade."

{¶ 14} About an hour later, the commission reconvened and discussed the proposed plan. Presumably referring to himself, House Speaker Cupp, and their map drawers, Senate President Huffman said, "[W]e've been working a lot of these past several days to try to resolve the General Assembly maps," and it was his understanding that "all of the Republican commissioners" had had an opportunity to review the proposed plan. Senator Sykes asked whether the other Republican commission members had participated in drafting the plan. Senate President Huffman responded: "I don't have a daily log or diary of what each of the other six members of the commission did. Everyone's had a chance to see it, make comments, suggestions, whatever it may be."

{¶ 15} After a recess, Senate President Huffman and House Speaker Cupp spoke in favor of the newly proposed plan. They indicated that the plan complied with this court's orders and had 54 Republican-leaning and 45 Democratic-leaning seats in the House and 18 Republican-leaning and 15 Democratic-leaning seats in the Senate. House Speaker Cupp further said that the plan had been "developed anew" and that about 73 percent of the districts were different from those in the commission's first revised plan. And he noted that in the House, the first revised district plan had had 12 "asymmetrical districts, as defined by the court" but that the newly proposed plan had "only five asymmetrical districts."[5]

{¶ 16} Senator Sykes expressed disappointment that other commission members were expecting him to vote on a proposed plan that he had received only hours earlier and without having had any opportunity to give input on the plan. He asked how the commission had complied with this court's directive that the commission itself—rather than individual commission members—engage in map drawing. Senate President Huffman replied, "[W]e're here now and we can talk about it." Senator Sykes and House Minority Leader Russo expressed concerns about the increased number of districts leaning Democratic by a margin of only 50

---

5. This court has not used the term "asymmetrical district." It appears that House Speaker Cupp was referring to districts leaning Democratic within the range of 50 to 51 percent.

to 52 percent with no Republican-leaning districts within that range, which they believed violated *League II*. House Speaker Cupp said that he interpreted this court's decision differently. The commission did not engage in any other discussion and voted four to three to adopt the newly proposed plan as the final General Assembly–district plan (the "second revised plan").

{¶ 17} Because both Democratic members of the commission voted against the plan, it did not have the bipartisan support required by Article XI, Section 8(B) to remain in effect for ten years. Therefore, the plan would remain in effect for no more than four years. Ohio Constitution, Article XI, Section 8(C)(1)(a).

{¶ 18} The "Article XI, Section 8(C)(2) Statement" adopted by the commission members who voted for the second revised plan noted that the commission had drawn an entirely new plan that met strict proportionality. The statement further noted that staff for all commission members had had access to the map drawers and that all commission members had been included in the map-drawing process. And the statement indicated that the second revised plan "addressed the asymmetry problem" identified in *League II* by having only five House districts and two Senate districts with a "partisan lean between 50 and 50.99%," which was the "same number of asymmetric House and Senate districts" found in the Sykes-Russo plan.

{¶ 19} Senator Sykes and House Minority Leader Russo submitted a separate statement indicating that the second revised plan failed to satisfy the Ohio Constitution and *League II*—especially this court's admonitions relating to the disproportionate allocation of toss-up districts. They also noted that despite this court's directions for the commission members to put aside partisan interests and work together to draw a constitutional General Assembly–district plan, the second revised plan had been "drawn entirely by Republican legislators on the Commission" without Senator Sykes's and House Minority Leader Russo's involvement and without allowing them an opportunity to give feedback. Auditor Faber, who voted against adopting the second revised plan, clarified that he did not concur with Senator Sykes and House Minority Leader Russo's statement.

{¶ 20} On February 25, the commission notified the court that it had adopted a General Assembly–district plan. That same day, the March 1 contempt hearing was continued and petitioners were ordered to file objections, if any, to the second revised plan by February 28. 166 Ohio St.3d 1410, 2022-Ohio-558, __ N.E.3d __; 166 Ohio St.3d 1411, 2022-Ohio 558, ___ N.E.3d ___.

### D. Petitioners file objections

{¶ 21} Petitioners in all three cases filed objections to the adoption of the second revised plan, arguing that it violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. They argue that the plan is unconstitutional because it disparately allocates all toss-up districts to the Democratic Party. The *Bennett* petitioners also argue that the plan violates Article XI, Section 1(C). With their objections, petitioners collectively submitted three new expert reports. Some petitioners ask this court to grant additional remedies, such as declaring that the Rodden III plan is constitutional or ordering the adoption of the Rodden III plan as the final General Assembly–district plan.

{¶ 22} Respondents submitted five separate responses to the objections. The commission members who voted to adopt the second revised plan argue that it complies with both Article XI and this court's orders in *League I* and *League II* and that we lack authority to grant the additional remedies petitioners seek. Senate President Huffman and House Speaker Cupp submitted an affidavit from Springhetti and a new expert report that evaluated the partisan properties of the second revised plan, the Rodden III plan, and the Sykes-Russo plan. Senator Sykes and House Minority Leader Russo filed a response asking this court to invalidate the second revised plan and, among other things, declare the Sykes-Russo plan constitutional. They also submitted affidavits detailing what they describe as the "secretive" and one-sided process leading to the commission's adoption of the second revised plan.

### III. ANALYSIS

#### A. The burden and standard of proof

{¶ 23} As we noted in our prior decisions in these cases, a district plan adopted by the commission is presumptively constitutional. *E.g.*, *League I*, ___

Ohio St.3d \_\_\_, 2022-Ohio-65, \_\_\_ N.E.3d \_\_\_, at ¶ 76. Petitioners therefore have the burden of proving that the second revised plan violates the Constitution. *See id*. at ¶ 76-77. They must prove factual issues beyond a reasonable doubt. *Id*. We do not defer to the commission's legal interpretations. *Id*. at ¶ 80.

### B. Article XI, Section 6(A)

{¶ 24} Article XI, Section 6(A) of the Ohio Constitution provides that the commission must attempt to meet the standard that "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party." Section 6(A) "requires this court to discern the map drawers' intent." *League I* at ¶ 116. Substantial and compelling evidence shows beyond a reasonable doubt that the main goal of the individuals who drafted the second revised plan was to favor the Republican Party and disfavor the Democratic Party.

{¶ 25} To start, evidence again shows that the commission did not follow the process that Article XI requires. *See League I* at ¶ 119-120; *League II*, \_\_\_ Ohio St.3d \_\_\_, 2022-Ohio-342, \_\_\_ N.E.3d \_\_\_, at ¶ 34. Article XI, Section 1(C) of the Ohio Constitution provides: "*The commission shall draft* the proposed plan in the manner prescribed in this article." (Emphasis added.) The commission has *adopted* three plans so far, but it still has not *drafted* one. Staff members of Senate President Huffman and House Speaker Cupp have drafted all three of the plans adopted by the commission.

{¶ 26} In *League I*, we noted that Senate President Huffman and House Speaker Cupp had controlled the map-drawing process to the exclusion of the minority-party and other commission members. *League I*, \_\_\_ Ohio St.3d \_\_\_, 2022-Ohio-65, \_\_\_ N.E.3d \_\_\_, at ¶ 118-120. And in *League II*, we observed that although the first revised plan had been adopted through more collaboration, the map-drawing process had still been controlled by Republican map drawers who answered only to Senate President Huffman and House Speaker Cupp. *League II* at ¶ 34. Senate President Huffman and House Speaker Cupp's nearly exclusive control over the first two rounds of map drawing was strong evidence of partisan intent. *See League I* at ¶ 120, quoting *Davis v. Bandemer*, 478 U.S. 109, 129, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), *abrogated on other grounds*

*by Rucho v. Common Cause*, ___ U.S. ___, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019) ("When a single party exclusively controls the redistricting process, 'it should not be difficult to prove that the likely political consequences of the reapportionment were intended' ").

{¶ 27} The evidence here is just as strong, if not stronger. The Democratic members of the commission had no opportunity to provide input in creating the second revised plan, and they had no meaningful opportunity to review and discuss it or to propose amendments once it was presented at the commission hearing on February 22, 2022.

{¶ 28} According to Senator Sykes, when the commission failed to adopt a plan by the February 17 deadline and House Speaker Cupp declared an impasse, the Republican commission members gave no indication that they were going to continue trying to develop a new district plan. In fact, Senate President Huffman said during the February 17 meeting of the commission that he did not think that it was possible to draw a compliant plan. And Secretary LaRose said that DiRossi and Springhetti had told him that the commission cannot "constitutionally do what the court majority has asked [the commission] to do." Senate President Huffman and House Speaker Cupp did not reveal that they were working on a new district plan until the commission meeting on February 22, when congressional redistricting was on the agenda and after this court had issued the show-cause order in these cases. At that point, Senate President Huffman told members of the media that he and House Speaker Cupp had been working on a new plan since February 11. Neither Senator Sykes nor House Minority Leader Russo had been included in that process. Moreover, it is clear that the commission again adopted a plan drawn by employees of the Republican caucuses, who, as even Secretary LaRose acknowledged (at the February 17, 2022 commission meeting), "work for the speaker and for the president." *See League I* at ¶ 119-120; *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 34.

{¶ 29} Similarly, not until 12:30 p.m. on February 24—the day the commission voted on and passed the second revised plan—were the minority-party commission members given a copy of the proposed plan for review. According to

House Minority Leader Russo, she "had no assurance that these exact maps would be the ones introduced at the Commission meeting." The commission convened to vote on the second revised plan at 6:00 p.m. that day, less than two hours after the final version had been posted on the commission's website. Until the final version was posted, House Minority Leader Russo did not know whether the plan to be voted on was the same one that she and Senator Sykes had been given earlier that afternoon.

{¶ 30} The process leading to the adoption of the second revised plan was at least as one-sided as the process that we found problematic in *League I* and even more one-sided than the process addressed in *League II*. Senate President Huffman and House Speaker Cupp did not allow the minority-party commission members to provide input on the second revised plan, much less let them participate in its creation. Nor does the record indicate that the other members of the commission— the statewide officeholders—engaged in any map drawing. According to House Minority Leader Russo, Secretary LaRose told her that he did not have staff with the technical expertise to draw maps. As before, the process was controlled entirely by Senate President Huffman and House Speaker Cupp. Just as in *League I* and *League II*, the one-sided process is evidence of an intent to draw a plan that favors the Republican Party at the expense of the Democratic Party. The commission should retain an independent map drawer—who answers to all commission members, not only to the Republican legislative leaders—to draft a plan through a transparent process.

{¶ 31} In all three of our opinions in these cases, we have identified a flawed process in which the General Assembly–district plan adopted by the commission has been the product of just one political party. The first dissenting opinion posits that our decision operates to "micromanage the commission," dissenting opinion of Kennedy and DeWine, JJ., ¶ 67, and to compel its seven members to "gather around a computer with the redistricting software and jointly draft a plan," *id*. at ¶ 68. But nothing in *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, or our opinion today suggests that we expect seven commission members to have "seven hands on the computer

mouse," dissenting opinion of Kennedy and DeWine, JJ., at ¶ 66. Instead, we expect the commission to abide by its Article XI duty to draft a plan, not to simply adopt one drafted by legislative staff at the direction of members of one political party. While the dissenters may interpret the words of the Constitution that instruct the commission to draw a plan as meaning that members of one political party alone may draw the plan, we do not.[6]

{¶ 32} The evidence shows that the map-drawing process for all three districting plans we have reviewed has been controlled by the Republican Party. The evidence shows that the individuals who controlled the map-drawing process exercised that control with the overriding intent to maintain as much of an advantage as possible for members of their political party. The commission has again adopted a plan in which a disproportionate number of toss-up districts are labeled Democratic-leaning. The second revised plan includes 19 Democratic-leaning House districts in which the Democratic vote share is between 50 and 52 percent. And it includes at least seven Senate districts in which the Democratic vote share is in that range. There are no Republican-leaning House or Senate districts that have a Republican vote share that is less than 52.7 percent. Indeed, only two Republican-leaning House districts have a Republican vote share of less than 55 percent, and no Republican-leaning Senate districts have a Republican vote share of less than 54 percent.[7] The result is that the 54 percent seat share for Republicans is a *floor* while the 46 percent share for Democrats is a *ceiling*—an

---

6. The first dissent's suggestion that we expect the commission members to have "seven hands on the computer mouse," dissenting opinion of Kennedy and DeWine, JJ., at ¶ 66, is itself a demonstrable fallacy. The dissenters already know that innumerable constitutionally compliant maps may be drawn by simple adjustments to an algorithm, something that political operatives, academics, and everyday citizens have shown may be easily generated. Because the party controlling the map-drawing process has intractably chosen outlier maps solely to maximize that party's partisan advantage, any "chaos" is of respondents' own creation. Article XI, Section 9 assigns to this court the sole responsibility for interpreting and enforcing the rules and standards that the people approved through their adoption of Article XI, notwithstanding the dissenters' persistent attempts to emasculate its core reforms. Resolving this self-created chaos thus depends not on the number of hands on the computer mouse but, rather, on the political will to honor the people's call to end partisan gerrymandering.

7. The weakest Republican-leaning House district has a vote share of 52.7 percent; the weakest Republican-leaning Senate district has a 54.3 percent vote share.

observation similar to the one we found persuasive in *League II*. *See League II* at ¶ 40.

{¶ 33} To be clear, the presence of toss-up districts in the plan is not alone the basis of our determination. The core of our determination is the plain language of Article XI, Section 6(A) of the Ohio Constitution: "No general assembly district plan shall be drawn primarily to favor or disfavor a political party." And the evidence here shows that the second revised plan, like the first two plans, was drawn primarily to favor the Republican Party and to disfavor the Democratic Party. The remarkably one-sided distribution of toss-up districts is evidence of an intentionally biased map, and it leads to partisan asymmetry. Under the second revised plan, if the statewide vote split 50/50 for Democrats and Republicans, Democrats would be expected to win approximately 44 percent of the House seats. In contrast, Republicans would be expected to win 53 percent of the House seats. Based on this calculation, Dr. Michael Latner, an expert retained by some of the petitioners, opined that "under likely election scenarios," the second revised plan performs *worse* than the first revised plan because it has a greater number of Democratic-leaning toss-up districts while containing no Republican-leaning toss-up districts. Dr. Rodden also addressed the partisan asymmetry of the second revised plan, noting that a 5 percent uniform swing in favor of the Republican Party across all districts would result in up to 23 additional Republican seats, while the same swing in favor of the Democratic Party would result in a gain of, at most, two seats. This asymmetry is further discussed below in relation to Article XI, Section 6(B).

{¶ 34} In *League II*, we held that "the *quality* of partisan favoritism" in the first revised plan was "monolithically disparate" because "every toss-up district [was] a 'Democratic district.' " (Emphasis sic.) *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 40. We explained that when a plan labels *every* "competitive" or "toss-up" district as a Democratic-leaning one, that is evidence of intent to favor the Republican Party. *Id.* The second revised plan bears the same hallmarks of improper partisan intent. The evidence shows—overwhelmingly—that the individuals who drafted the second revised plan

14

primarily intended to favor the Republican Party and disfavor the Democratic Party. The second revised plan therefore violates Article XI, Section 6(A) of the Ohio Constitution.

{¶ 35} The first dissent suggests, however, that this court lacks the constitutional authority to determine whether the commission has acted primarily to favor Republicans and disfavor Democrats because we do not have judicial authority to review the "subjective requirements" of Section 6(A). Dissenting opinion of Kennedy and DeWine, JJ., at ¶ 115. Because compliance with Section 6(A)'s "subjective requirements" is "solely a matter of degree," *id.* at ¶ 133, the first dissenting opinion contends that we may not review those requirements, because we have no objective guides to confine our review. But as we explained in *League I*, the original jurisdiction conferred by Article XI, Section 9 does not limit this court's ability to review a General Assembly–district plan for compliance with Section 6(A). ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 94-96. Nor do we agree that the requirements of Section 6(A) are somehow beyond judicial ken. *See Rucho*, ___U.S. at ___, 139 S.Ct. at 2507, 204 L.Ed.2d 931 ("We do not understand how * * * a provision saying that no districting plan 'shall be drawn with the intent to favor or disfavor a political party' provides little guidance on the question").

{¶ 36} As a final matter, we note that Senate President Huffman appears to have voted against the Sykes-Russo plan based, at least in part, on a misunderstanding of Section 6(A). Invoking Section 6(A), Senate President Huffman criticized the Sykes-Russo plan because, he said, it would have made it hard, if not impossible, for some Republican incumbents to retain their seats. Making that observation demonstrates, beyond a reasonable doubt, that Senate President Huffman misunderstands the requirements of Article XI and the reasons for their adoption. Currently, the General Assembly is marked by extreme disproportionality, with the Republican Party holding substantial majorities in both the Senate and the House. The district plan that facilitated that disproportionality was the basis for the adoption of Article XI. Senate President Huffman's concern for protecting incumbents is not grounded in Article XI.

{¶ 37} The dissenting opinions suggest, however, that incumbent protection is a legitimate and neutral goal in legislative redistricting. Dissenting opinion of Kennedy and DeWine, JJ., at ¶ 104; dissenting opinion of Fischer, J., ¶ 176. Therefore, the argument goes, the protection of incumbents does not show intent to favor or disfavor a political party. But while incumbency protection *may* be a legitimate and neutral goal, it is not *always* so. "[E]xperience teaches that incumbency protection can take various forms, not all of them in the interests of the constituents." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 441, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (lead opinion). In this case, we analyze the evidence of Senate President Huffman's concern for not drawing any incumbent Republican caucus member out of a district (based on current voting residence) to be grounded in a desire to protect Republican office holders. Those office holders hold office under a current district plan that is neither compact nor proportional according to the terms of Article XI. Thus, efforts to protect these incumbents in noncompliant districts can neither be a legitimate and neutral goal nor comport with Article XI, Section 6(A).

### C. Article XI, Section 6(B)

{¶ 38} Article XI, Section 6(B) of the Ohio Constitution provides that the commission shall attempt to draw a district plan that meets the following standard: "The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." In *League II*, we held th.at the first revised plan violated Section 6(B) because a high percentage of the districts allocated to the Democratic Party had a Democratic vote share between 50 and 51 percent. *See League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 40 and 61. In fact, nine House districts had a Democratic vote share between 50.0 and 50.5 percent, and the plan included no Republican-leaning districts with a Republican vote share less than 52.6 percent. *Id.* at ¶ 57. Although we clarified that Section 6(B) does not prohibit competitive districts, we concluded that competitive districts "must either be excluded from the

16

proportionality assessment or be allocated to each party in close proportion to its statewide vote share." *Id*. at ¶ 62.

{¶ 39} The second revised plan reduces the number of Democratic-leaning districts with a Democratic vote share between 50 and 51 percent, but it dramatically *increases* the number of Democratic-leaning districts with a Democratic vote share of 52 percent or less. As explained above, under the second revised plan, there are 19 House districts and 7 Senate districts—43 percent of all Democratic-leaning districts—that have Democratic vote shares between 50 and 52 percent. There are no Republican districts with a vote share less than 52.7 percent.

{¶ 40} In *League II*, we did not define the outside limit of what makes a district competitive. We did not need to, because the districts at issue—those between 50 and 51 percent—were "surely" competitive "under any reasonable measure" and therefore had to be excluded from the proportionality assessment. *Id*. The question now is whether districts between 51 and 52 percent can be allocated to a political party for purposes of the proportionality assessment. That is, we must determine whether districts with vote shares in that range "favor" a political party within the meaning of Section 6(B). *See id*. at ¶ 61.

{¶ 41} The expert evidence discussed above leads us to conclude that the 26 districts in the second revised plan with a Democratic vote share between 50 and 52 percent do not "favor" the Democratic Party. Indeed, the evidence shows that those districts represent the foundation of a politically asymmetric plan. According to Dr. Latner, with a two-point statewide swing in their favor, Republicans could expect to win 74 percent of House seats and 79 percent of Senate seats under the second revised plan. The same two-point statewide swing favoring Democrats would result in no seat gains for the Democratic Party in either the House or the Senate. Dr. Rodden opines that even with "a truly historic 7 percentage point uniform swing in favor of the Democrats" (meaning that their statewide vote share rose to 53 percent), the Democrats still would not gain a majority of seats in the House. According to Dr. Rodden, Democrats would need to obtain "a truly

remarkable 8 percentage point swing" to give them a one-seat majority in the House.[8]

{¶ 42} Based on this evidence, we conclude that the sub-52-percent districts allocated to the Democratic Party under the second revised plan are "competitive" districts and, under our holding in *League II*, must be excluded when assessing the plan's overall proportionality. *See League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 62. When the 26 so-called Democratic-leaning districts in that range are excluded, the second revised plan has 72 Republican districts and 34 Democratic districts, for a total of 106 non-excluded districts. This gives Republicans a 67.9 percent share of the non-excluded districts (72 out of 106) and Democrats 32.1 percent (34 out of 106). That disproportionality is further from even the original plan we invalidated in *League I*, in which 64.4 percent of the districts favored Republicans. *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 105. The second revised plan thus does not "correspond closely" to the statewide preferences of Ohio's voters and violates Article XI, Section 6(B) of the Ohio Constitution.

{¶ 43} In reaching this conclusion, we note, again, that the existence of competitive districts is not inherently problematic. The gross and unnecessary

---

8. In *League II*, we observed that the commission "knowingly adopted a [revised] plan in which all the House districts whose voters favor Republicans do so at vote shares of 52.6 percent and above, while more than a quarter (12 out of 42) of the House districts whose voters 'favor' Democrats do so at a vote share between 50 and 51 percent (meaning that a 1 percent swell in Republican vote share would sweep 12 additional districts into the Republican column)." ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 40. The first dissenting opinion highlights the "1 percent swell," noting that this factor no longer applies to the second revised plan. Dissenting opinion of Kennedy and DeWine, JJ., at ¶ 102. Thus, they say we are "rewriting the rules" by "assert[ing] that a *5 percent* swing of voters to the Republican Party would result in 23 more Republican seats while a similar swing would net Democrats at most two seats." (Emphasis sic.) *Id.* at ¶ 102. But the first dissent mischaracterizes *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___. We did not rely in *League II* on the hypothetical 1 percent swing as the baseline rule for evaluating a plan's partisan favoritism. To be sure, the "monolithically disparate," *id.* at ¶ 40, distribution of districts whose vote shares were between 50 and 51 percent was an important factor in our evaluation of the revised plan in *League II* because it was evidence of unconstitutional partisan favoritism and illustrated the absurdity of characterizing such districts as Democratic-leaning. In this case, petitioners' experts have analyzed the effects of 2, 5, 7, or 8 percent swings in vote share and concluded that Democrats would gain far fewer seats with vote swings in their favor than would Republicans. This is evidence of partisan asymmetry that is indicative of the second revised plan's partisan bias.

disparity in the allocation of close districts is what offends Article XI, Section 6(B). *See League II* at ¶ 62.

## IV. CONCLUSION

{¶ 44} We sustain petitioners' objections relating to the second revised plan's violation of Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. We invalidate the second revised plan in its entirety. We further order the commission to be reconstituted and to convene and that *the commission* draft and adopt an entirely new General Assembly–district plan that conforms with the Ohio Constitution, including Article XI, Sections 6(A) and 6(B) as we have explained those provisions in each of our three decisions in these cases. To promote transparency and increase public trust, the drafting should occur in public and the commissioners should convene frequent meetings to demonstrate their bipartisan efforts to reach a constitutional plan within the time set by this court. We deny petitioners' requests for additional relief at this time.

{¶ 45} We further order the commission to file the district plan with the secretary of state no later than Monday, March 28, 2022, and to file a copy of that plan in this court by 9:00 a.m. on Tuesday, March 29, 2022. We retain jurisdiction for the purpose of reviewing the new plan.

{¶ 46} Petitioners shall file objections, if any, to the new plan, by 9:00 a.m., three days after the new plan is filed in this court. Respondents shall file responses, if any, to the objections, by 9:00 a.m., three days after the objections are filed. If the deadline for the objections or responses falls on a Saturday, Sunday, or holiday, then the objections or responses shall be filed by 9:00 a.m. on the next business day. Petitioners shall not file a reply or any motion for leave to file a reply. The clerk shall refuse to accept any filings under this paragraph that are untimely or prohibited.

{¶ 47} No requests or stipulations for extension of time shall be filed, and the clerk of this court shall refuse to file any requests or stipulations for extension of time.

**{¶ 48}** Because we sustain the objections as to Article XI, Sections 6(A) and 6(B) and invalidate the plan in its entirety, we do not reach petitioners' objections regarding Article XI, Section 1.

Objections sustained in part.

O'CONNOR, C.J., and DONNELLY and STEWART, JJ., concur.

BRUNNER, J., concurs, with an opinion.

KENNEDY and DEWINE, JJ., dissent, with an opinion.

FISCHER, J., dissents, with an opinion and joins paragraphs 138-143 of the dissenting opinion of Justices Kennedy and DeWine.

_____

**BRUNNER, J., concurring.**

**{¶ 49}** I fully join the majority opinion, but I write separately to address the contentions set forth in both dissenting opinions that Article XI of the Ohio Constitution should be interpreted to mean that redistricting is an inherently political process that should be left to the politicians. This court is not a rubber stamp. By interpreting and enforcing the requirements of the Ohio Constitution, we do not create chaos or a constitutional crisis—we work to promote the trust of Ohio's voters in the redistricting of Ohio's legislative districts according to Article XI, which the voters adopted.

**{¶ 50}** That elections will occur in our system is a given, regardless of whether they occur in a year following redistricting. When the redistricting process is interjected with abject and continuous refusals to abide by the requirements of our Constitution and the orders of this court, remedies may become consequences in order to permit an election to happen, promoting both ballot access by candidates and voter enfranchisement. Driving litigation to the brink of making it impossible to hold an election is not a substitute for nor a permissible threat against doing what is necessary to draft a district plan that complies with Article XI of the Ohio Constitution.

**{¶ 51}** The dissents emphasize that because the Ohio Redistricting Commission is comprised of partisan elected officials, Article XI contemplates that bipartisan agreement may not be possible. This is a subjective and inaccurate

conclusion. For example, the Constitution does not limit the number of political parties to two. *See* Ohio Constitution, Article XI, Section 1(A). It refers to the "largest political party" and "two largest political parties," not merely "two political parties." *Id.*

{¶ 52} The tenor of this "let politics decide politics" approach is not grounded in the Ohio Constitution. Rather, it is an oversimplistic, myopic, parochial, two-party view that would have us look askance at our duties and treat the redistricting process as a political duel or mud-wrestling match between political competitors to decide a very serious endeavor: the decennial exercise adopted by the voters of Ohio to ensure fair and accurate representation in the government.

{¶ 53} The colored map of Ohio inserted into the first dissenting opinion showing a single year's (2020) partisan statewide general-election results is not evidence submitted by any party in these cases. *See* dissenting opinion of Kennedy and DeWine, JJ., ¶ 89. It was created by or on behalf of one or both drafters of that dissenting opinion to make a point that is not based in the Constitution. Article XI, Section 6(B) requires that the statewide proportion of districts whose voters, based on "statewide state and federal partisan general election results during the last *ten* years, favor each political party * * * correspond closely to the statewide preferences of the voters of Ohio." (Emphasis added.) The first dissenting opinion's map is an attempt to support the specious arguments that Ohio is hopelessly divided into Democratic-leaning urban areas and Republican-leaning rural areas and that Ohio is now so "red" (based on one year's election results) that its political geography makes it impossible to draw a constitutionally compliant plan.

{¶ 54} The first dissenting opinion then seems to argue that due to Ohio's political geography, applying Article XI, Section 6(A) would require some sort of reverse gerrymandering. The majority opinion does not endorse any sort of gerrymandering. It merely requires that a constitutionally compliant plan be "drawn" by the commission. This court has not drawn any district plan or even ordered that a particular plan be adopted. *See* Ohio Constitution, Article XI,

Section 9.  This court cannot order gerrymandering; it may only order compliance with the Ohio Constitution, and that is what it has done.

{¶ 55} Thus, if we identify districts that are not truly competitive but, rather, are "toss-up" districts, we must discount the genuineness of the intent in creating them, especially when such districts are compared to districts in which there is a clearer majority.  Toss-up districts do not go in the column of districts that lean toward one party or another.  When a plan containing all the districts is analyzed and the districts are compared for their partisan leaning, this court is authorized to find a lack of proportionality under Article XI, Section 6(A) and order that the plan be revised or redrawn.  When that occurs, as it has twice before in these cases, it is the redistricting commission's task to find a way to draw a fair and constitutionally compliant plan, not to draw districts that ensure seats for incumbent legislators whose districts are part of a scheme that was determined by Ohioans to be the result of gerrymandering.

{¶ 56} The first dissenting opinion goes on to offer a flowchart and a sentence diagram, presumably to try to explain its application of the plain language of Article XI.  Again, neither of those representations are evidence in the record, and at best, they seem to be offered as illustrative support for arguments that propel more vitriol than constructive commentary.

{¶ 57} The first dissenting opinion's complete denial of this court's discretion in analyzing a district plan under Article XI, Section 6(A) comes from its position that judicial review under the provision falls under the moniker of "subjectivity," though the dissent concedes that judicial review of "objective" mechanical requirements is permissible.  The dissenting justices would construe the Constitution as leaving this court feckless to call out the equivalent of a sleight of hand, such as a plan with perfectly proportional districts on the surface but that is in reality a shell for what the drafters purport to be compliance with statewide partisan voter preferences.  This court's review and determination under Article XI, Section 6(A) must be applied through *both* the lens of proportionality and the lens of fair intent.

{¶ 58} The plain language of Section 6 authorizes this court to use its discretion in analyzing a district plan when the evidence calls for it. There is no doubt that this is one of those instances. It is to that end that the majority opinion leans, and not toward a partisan purgatory that will never provide the fairness for which Ohio voters have so long yearned and which prompted them to adopt the amendments to Article XI.

_____

**KENNEDY and DEWINE, JJ., dissenting.**

{¶ 59} The majority decrees electoral chaos. It issues an order all but guaranteed to disrupt an impending election and bring Ohio to the brink of a constitutional crisis. It does so through an edict that finds no grounding in the text of the Constitution but instead is merely the latest manifestation of the majority's shifting whims.

{¶ 60} Three times now, the Ohio Redistricting Commission has enacted a General Assembly–district plan. And three times now this court has struck down the enacted plan. In the last go-round, we pointed out that the majority had shifted the goalposts by imposing new requirements found nowhere in the Ohio Constitution and not suggested in its first opinion. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 115 (Kennedy and DeWine, JJ., dissenting) ("*LWV II*"). Today, the majority tears down those goalposts altogether. It ignores the standards set forth in the Constitution. And now that the rationales manufactured in its previous opinions counsel in favor of upholding the latest plan ("the second revised plan"), *see League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___ ("*LWV I*"); *LWV II*, the majority ignores those too. Its latest command to the commission is simply this: *What the Constitution says doesn't matter—bring us a map that will achieve the political outcomes we desire. We'll know it when we see it.*

{¶ 61} The majority gives two reasons for invalidating the second revised plan, neither grounded in the Constitution. First, it complains that the seven commissioners did not cooperate and jointly draft the plan. And second, even

though the plan perfectly reflects the statewide distribution of votes between Republicans and Democrats, the majority finds it defective because it contains some competitive districts that favor the Democratic Party by 2 percent or less. The Constitution does not require all seven members to jointly operate the map-drawing software. Instead, it expressly provides that if the members fail to achieve bipartisan consensus, then the commission may introduce and adopt a General Assembly–district plan by a party-line majority vote, with the consequence being that the plan lasts for only four years. Article XI, Section 8(C)(1)(a). And the Constitution details a formula to measure proportionality based on the number of districts that "favor" a political party. Section 6(B). Nowhere does the Constitution ordain that competitive districts that favor a political party by less than 2 percent don't count.

{¶ 62} No one at this point can fairly call what the majority is doing the act of judging. It does not assess the plan against constitutional standards. Rather, it has commandeered the redistricting process—only instead of moving the redistricting software to the Thomas J. Moyer Ohio Judicial Center, it has forced the commission to attempt to draw the map of the majority's mind's eye. Alexander Hamilton promised that judges would exercise "neither force nor will, but merely judgment." The Federalist No. 78. The majority proves Hamilton overly optimistic.

{¶ 63} Through its actions today, the majority undermines the democratic process, depriving the voters of the constitutional amendment they enacted and leaving in its place only the majority's policy preferences. In so doing, it threatens the very legitimacy of this court.

{¶ 64} We adhere to our view that this court's review is not so far reaching as the majority believes and would hold that a General Assembly–district plan cannot be invalidated absent a violation of the express and objective map-drawing requirements of Article XI, Sections 2, 3, 4, 5, and 7. Because the majority goes far beyond these guardrails, we dissent.

## I. The majority tears down the goalposts it erected and imposes new standards found nowhere in the Constitution

{¶ 65} At the outset, it is important to reiterate that we should not be here at all. Article XI, Section 9(D)(3) of the Ohio Constitution is explicit in providing that the Supreme Court may order the commission to adopt a new map only if it "determines that a general assembly district plan adopted by the commission does not comply with the requirements of Section 2, 3, 4, 5, or 7 of this article." The majority finds violations of only Section 6, so it has no authority to invalidate the second revised plan. It's that simple.

{¶ 66} In our dissents in *LWV I* and *LWV II*, we repeatedly detailed the court's lack of authority to do what the majority keeps doing, so we will save further discussion on that point for Part III of this dissent. Instead, we start by explaining that even putting aside the court's lack of authority to order yet another new map, what the majority does today is inconsistent with both the text of the Constitution and the goalposts set by its previous opinions.

### A. Seven hands on the computer mouse

{¶ 67} Perhaps the most remarkable thing about the majority's opinion today is its new "seven drafters working together" requirement. One of the majority's principal justifications for finding the second revised plan unconstitutional has nothing to do with the plan itself; rather, the majority deems the plan unconstitutional because "the commission did not follow the process that [Section 1 of] Article XI requires." Majority opinion, ¶ 25. Although the majority represents that it will not address arguments related to Article XI, Section 1, it plainly cannot pass up an opportunity to micromanage the commission.

{¶ 68} In the majority's view, Article XI, Section 1 requires that all seven commissioners gather around a computer with the redistricting software and jointly draft a plan. Because this did not happen, the majority finds that the commission failed to comply with a sentence in Article XI, Section 1(C) providing that "[t]he commission shall draft the proposed plan in the manner prescribed in this article." *See* majority opinion at ¶ 25; *see also id.* ("The commission has *adopted* three plans so far, but it still has not *drafted* one"). And with minimal analysis, the majority

declares that the commissioners' failure to collectively "draft" the second revised plan *dispositively* establishes that it was drawn primarily to favor the Republican Party.

{¶ 69} This, of course, is ludicrous. Go back to the sentence the majority finds all important: "The commission shall draft the proposed plan in the manner prescribed in this article." Section 1(C). For the majority's reading to even begin to make sense, "commission" would instead need to say "commissioners." But more to the point, the majority ignores the last clause of the sentence it relies on: "in the manner prescribed in this article." *Id.*

{¶ 70} Article XI prescribes in Section 1(A) that the "Ohio redistricting commission shall be responsible for the redistricting of this state for the general assembly." To discharge that duty, the commission "shall adopt" a General Assembly–district plan. Section 1(C); *see also* Section 9(D)(1) (requiring that all plans be "approved by the commission"). Article XI then provides that some actions of the commission require a bipartisan vote. There must be bipartisan agreement to approve a map that lasts ten years. Section 8(B). There also must be bipartisan agreement to adopt rules, hire staff, and expend funds. Section 1(B)(2). Pursuant to this delegation, the commission unanimously adopted Commission Rule 09: "Any member of the Ohio Redistricting Commission, person, or organization may submit for the consideration of the Commission a proposed general assembly district plan." *Ohio Redistricting Commission Rules, Rule 09, Redistricting plans,* https://redistricting.ohio.gov/assets/organizations /redistricting-commission/events/commission-meeting-august-31-2021-16/ohio-redistricting-commission-rules.pdf#page=1 (accessed March 15, 2022) [https://perma.cc/F6DM-D4EW].

{¶ 71} Nonetheless, the commission is composed of partisan elected officials, and therefore Article XI anticipates that bipartisan agreement may not always be possible to obtain. It creates a default rule that (save for specific, contrary provisions), "a simple majority of the commission members is required for any action by the commission." Article XI, Section 1(B)(1). Although the majority faults the commission for not hiring "an independent map drawer * * * who

answers to all commission members," majority opinion at ¶ 30, the Constitution left that decision to the commission. Where agreement eludes the commissioners, each co-chairperson may "expend one-half of the [commission's] funds." Section 1(B)(2)(b). A co-chairperson hiring a map drawer, as happened here, is a permissive expenditure.

{¶ 72} Nor is the commission required to draft all plans as a body. Instead, if the commission reaches an impasse, it "shall introduce a proposed general assembly district plan by a simple majority vote of the commission." Article XI, Section 8(A)(1). Section 8(A)(3) permits the commission to "adopt a final general assembly district plan * * * by a simple majority vote of the commission." A plan that lacks bipartisan support and that is passed by a simple majority cannot be one that has been drafted by all seven commissioners. Doing that does not invalidate the plan; rather, the sole consequence is that it lasts four years rather than ten. Article XI, Section 8(C)(1)(a).

{¶ 73} The majority's rule is patently ridiculous. It never explains how a plan that is introduced and adopted by a simple majority can somehow have been collectively drafted. The Constitution provides for the impasse procedure exactly because such agreement is not always—or even likely—possible when the balance of political power is at stake.

{¶ 74} The second revised plan was introduced and approved by the commission. Article XI, Section 1 requires nothing more. The second revised plan was adopted "in the manner prescribed in [Article XI]." Section 1(C).

{¶ 75} If one needs further proof of the folly of the majority's reasoning, consider that pursuant to the commission's rules, several members of the public submitted plans to the commission. Under the majority's position today, had the commission decided to adopt one of the public proposals, that would have violated the Constitution because *the commission*—more precisely, its seven constituent members—must "draft" the plan. The same would hold true had the commission adopted Senator Sykes's proposed plan or *any* of the plans drafted by Dr. Jonathan Rodden, one of petitioners' experts.

{¶ 76} Indeed, anyone who has ever served on a committee recognizes that the work of a committee is rarely, if ever, done jointly by all the members of the committee. Legislative committees are routinely tasked with preparing reports. The members do not sit down together and jointly write the report. Instead, a report is drafted by legislative staff and voted on by the whole committee. Almost invariably, there are those who disagree—leading to majority and minority reports.

{¶ 77} The same is true for this court. The majority issues a per curiam opinion. But one can be sure that the four members in the majority did not sit down jointly at a computer and take turns keying in words. And of course, those of us in dissent played no part in writing today's per curiam opinion.

{¶ 78} We often celebrate the "drafters" of our federal Constitution. But no one believes its 39 signatories jointly worked through every word and clause. Rather, it is known from James Madison's Notes and other sources, *see* 2 Farrand, *The Records of the Federal Convention of 1787* (Rev.Ed.1966), that the convention delegates were assigned to various committees. Only five of our Founding Fathers served on the Committee of Style and Arrangement credited with producing the final draft, yet we still remember their 34 fellow delegates as "drafters" of the charter.

{¶ 79} What the majority demands belies common sense. One can just imagine seven people looking at a computer screen, each with their own ideas about which direction to move the cursor. Do the members vote on every toggle of the mouse? Solve disputes through games of rock, paper, scissors? Or is it more of a scrum, with the strongest prevailing?

{¶ 80} The majority's complaint is that the Republicans did not work together with the Democrats. But that lament is as old as our two-party system. Small wonder that the Constitution incentivizes bipartisanship and imposes a consequence for lack of cross-aisle cooperation. *See* Article XI, Section 8(C)(1)(a). If the parties do not work together—if a plan is passed by only a partisan majority vote—the plan lasts only four years. *Id.* In invalidating a plan for a lack of cooperation, the majority replaces the remedy set forth in the Constitution with one purely of its own making.

**{¶ 81}** Nothing in the Constitution requires the seven commissioners to sit down together to draft the plan—effectively handing each one of them an unbridled veto power. Nothing in the majority's previous opinions established this as a requirement to adopt a valid plan. And certainly nothing in the Constitution gives this court the authority to invalidate a plan for failure to comply with this made-up requirement. Under Section 9(D)(3), the court's remedial authority is triggered only by a violation of Section 2, 3, 4, 5, or 7. This court has no business micromanaging the procedures by which the commission discharges its duty to "adopt" a plan. This court has no business micromanaging the procedures by which the commission discharges its duty to "adopt" a plan. *See Youngstown City School Dist. Bd. of Edn. v. State*, 161 Ohio St.3d 24, 29, 2020-Ohio-2903, 161 N.E.3d 483, ¶ 20 (lead opinion of O'Connor, C.J.) ("It is not our role to police how the amended language came into existence"); *id.* at ¶ 36, quoting *Miller v. State*, 3 Ohio St. 475, 484 (1854) (Kennedy, J., concurring in part and concurring in judgment only in part) (courts are not "authorized to supervise every step of legislative action, and inquire into the regularity of all legislative proceedings that result in laws").

### B. *Perfect proportionality is not good enough for the majority*

**{¶ 82}** Article XI, Section 6(B) provides that the commission "shall attempt" to draw a plan under which "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party [and] correspond closely to the statewide preferences of the voters of Ohio." The statewide preference of Ohio voters is to prefer Republicans to Democrats by a margin of 54 to 46 percent. *LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 108. In the second revised plan, 54 percent of districts favor the Republican Party and 46 percent favor the Democratic Party. A reasonable person would likely conclude that because the plan achieves perfect proportionality, it satisfies Section 6(B). But, through a dizzying series of changing edicts, the majority concludes that even exact proportionality is not good enough.

### 1. Shifting the goalposts on statewide proportionality

{¶ 83} In *LWV I*, the majority read the word "attempt" out of Section 6(B) and held that the provision actually *mandates* that the commission draw a plan with a partisan makeup that closely corresponds with statewide voter preferences if it is possible to do so. *LWV I* at ¶ 88. In *LWV II*, the court read the word "closely" out of the provision and suggested that a plan needed to exactly correspond to statewide voter preferences. *LWV II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 63, 64. That measure, it proclaimed, is "a foundational ratio created not by this court or by any particular political party but instead etched by the voters of Ohio into our Constitution." *Id.* at ¶ 64.

{¶ 84} In response, the commission did exactly what the majority demanded. It drew a plan in which "[t]he statewide proportion of districts whose voters * * * favor each political party" matched exactly the "statewide preferences of the voters of Ohio," Section 6(B). The second revised plan is perfectly proportional, matching the 54-46 percent partisan makeup of Ohio voters.

{¶ 85} Unbelievably, the majority now says that even perfect proportionality is not good enough. Given the standardless judging exhibited in *LWV I* and *LWV II*, it comes as no surprise that the majority introduces a new formula. Even though the Constitution says that statewide proportionality is to be assessed by comparing the proportion of districts that "favor" each political party, Section 6(B), the majority looks at individual districts and determines that those that favor a political party by less than 2 percent should be excluded from the calculation. It then holds that the plan is unconstitutional because if one replaces the formula set forth in the Constitution with the majority's new formula, the plan fails to meet the Constitution's proportionality requirement. Confused? We certainly are. High marks to the majority for creativity, but nothing in the Constitution supports the exclusion of competitive districts—Section 6(B)'s terms address *statewide* proportionality and therefore include *all districts*.

### 2. Shifting the goalposts on competitive districts

{¶ 86} The majority also shifts the goalposts on what counts as a competitive district. In *LWV I*, the majority held that Section 6(B) simply required

30

the commission to draw "a plan in which the statewide proportion of Republican-leaning districts to Democratic-leaning districts" complies with 54-46 percent ratio. ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 108. But in *LWV II* it modified that pronouncement, invalidating the first revised plan because it created too many competitive districts that only narrowly favored Democrats. ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 61 ("Bluntly, the commission's labeling of a district with a Democratic vote share between 50 and 51 percent * * * as 'Democratic-leaning' is absurd on its face").

{¶ 87} Of course, the Constitution does not preclude super-competitive districts—in fact, they are laudable in a democracy. *See Rucho v. Common Cause*___ U.S. ___, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019). Indeed, the more competitive a district, the more an election will be decided by voter preference and candidate quality rather than simple partisan voting patterns. The Ohio Constitution requires an assessment of "districts whose voters * * * favor each political party." Article XI, Section 6(B). Nonetheless, the commission did what the majority demanded. Its second revised plan reduced from 12 to five the number of seats favoring Democrats by less than 51 percent.

{¶ 88} But, alas, poor Charlie Brown has had the football yanked away again. Now, the majority says that even districts in which Democrats have a 2 percent advantage do not count as districts that " 'favor' [the Democratic] party." Majority opinion, ¶ 41. If the majority is going to create new requirements not found in the Constitution, it would certainly be nice if it would give the commission a little advance warning.

{¶ 89} The majority objects to the outsized number of Democratic-leaning competitive districts. But that is simply a function of political geography. Just look at a map of Ohio's Republican vote share by county in the last presidential election:[9]

---

9. This map was created using data from the Ohio Secretary of State's Office. *See* Ohio Secretary of State, 2020 Official Elections Results, available at https://www.ohiosos.gov/elections/election-results-and-data/2020/ (accessed Mar. 15, 2022) [https://perma.cc/5S4N-ZPMQ]. It was created using a template available at https://commons.wikimedia.org/wiki/File:Ohio_Presidential_Election_Results_2020.svg (accessed Mar. 15, 2022) [https://perma.cc/3XQ6-NEE7].



{¶ 90} Every expert who has opined on the matter in these cases agrees that because Democratic voters are concentrated in a few urban areas and Republican voters predominate in large rural swaths of the state, there are limited geographic areas in which Democratic-leaning districts can be created. *LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 128. A natural function of this political

reality is that the only way to meet the proportionality standard is to maximize the number of Democratic-leaning districts in urban areas. And maximizing the number of Democratic-leaning districts means that many of these districts will favor the Democratic Party by narrow margins. In contrast, in most of the rural, red areas of the state, it is impossible to draw districts that narrowly favor the Republican Party—there simply are not enough Democrats in those areas. *See LWV II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 82-86 (Kennedy and DeWine, JJ., dissenting) (providing a more detailed discussion of Ohio's political geography).

{¶ 91} Indeed, at the time of the amendment's enactment the former chairman of the Ohio Democratic Party explained that

> computer modeling showed the process [under the amended version of Article XI] likely would not give Democrats a majority.
>
> "When you get modeling back that says you're confining yourselves to a permanent minority and Democrats will never get to 50, that gave many people pause," said state Democratic chairman David Pepper * * *. "We weren't looking for, and we didn't find, any models that showed we could guarantee ourselves a majority. Frankly, *that would be gerrymandering just like in the past* * * * the most important change is there would be *many more competitive races*."

(Emphasis added and second ellipsis in original.) *Vote yes on Issue 1*, Columbus Dispatch (Sept. 27, 2015) 5J.

{¶ 92} The majority, though, never acknowledges the undisputed evidence about the challenges inherent in creating sufficient Democratic-leaning districts to satisfy the proportionality requirement. Instead, it makes much of the fact that 19 Democratic-leaning districts are competitive and cites expert testimony stating that a 2 percent change in the voting preferences of Ohioans would cause Democrats to lose these districts. In doing so, the majority relies on predictions of future

performance instead of applying the plain language of Section 6(B), which requires the commission to consider "statewide state and federal partisan general election results during *the last ten years*." (Emphasis added.) Section 6(B) does not authorize the commission to base proportionality on any other metric, including predictions of future results.

{¶ 93} In demanding that the commission adopt a plan designed to guarantee Democratic wins, even in the face of changing voter preferences, the majority compels what the Constitution forbids: gerrymandering. This is the same majority that decried gerrymandering in *Adams v. DeWine* as "the antithetical perversion of representative democracy." ___ Ohio St.3d ___, 2022-Ohio-89, ___ N.E.3d ___, ¶ 2. Gerrymandering, it said, "is an abuse of power * * * that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party." *Id.* Abandoning its pretense of upholding democratic principles, the majority makes clear today that notwithstanding the quality of candidates, the performance of incumbents, or the issues that matter to voters and drive turnout, winners and losers in statehouse elections must not be chosen on election night but instead must be preordained by the commission's plan.

*3. Shifting the goalposts on alternative "more proportional" plans*

{¶ 94} In concluding in *LWV I* that the enacted plan unduly favored the Republican Party, the majority pointed to a plan prepared by Dr. Rodden, one of petitioners' expert witnesses, as evidence that it was possible to draw a more proportional plan that complied with constitutional requirements. ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 126. The Rodden plan contained 57 Republican leaning House districts and 18 Republican leaning Senate districts. (It turned out that Dr. Rodden's plan did not comply with constitutional requirements—a fact petitioners were forced to admit in a filing to the court after *LWV I* was decided.) In *LWV II*, the majority pointed to a plan prepared by Democratic Party operative Chris Glassburn—apparently finalized only after the commission had adopted the first revised plan—as evidence that it was possible to draw a more proportional plan. ___Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d

34

___, at ¶ 46. The Glassburn plan contained 54 Republican House seats and 18 Republican Senate seats.

{¶ 95} On this go-round, though, the majority throws out its previous benchmarks. The second enacted plan contains more Democratic-leaning districts than the Rodden plan, which the majority held up as a model in *LWV I*, and it contains exactly the same number as the Glassburn plan. But now that those benchmarks counsel upholding the plan, they apparently no longer matter.

{¶ 96} Notably absent from the majority opinion is any reference to a map that is more proportional than the second enacted plan. And for good reason. One does not exist. It is telling in this regard that the plan that petitioners would have this court order the commission to adopt actually creates *fewer* districts that favor the Democratic Party than the second revised plan.

### 4. *Shifting the goalposts on statistical measures*

{¶ 97} A revealing feature of these three cases is the shifting use of statistical measures by petitioners' experts and the majority. Instead of applying a consistent set of measures to fairly assess each of the three plans, the petitioners and the majority have simply cherry-picked statistics to support their favored outcomes.

{¶ 98} For example, in *LWV I*, the majority relied heavily on Dr. Kosuke Imai's 5,000 simulated plans to show that the commission could have drawn a more proportional plan and that it could have done so without disfavoring Democrats. ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 112. In *LWV II*, the majority relied on Dr. Imai's 5,000 simulated plans to contend, incorrectly, that the first revised plan was an outlier. ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 43. In fact, the first revised plan was more proportional than most of Dr. Imai's 5,000 plans: "the average of the 5,000 plans he generated contained 79 total Republican-leaning districts (60 percent) and 53 total Democratic-leaning districts (40 percent)." *Id.* at ¶ 110 (Kennedy and DeWine, JJ., dissenting).

{¶ 99} So what does Dr. Imai have to say about the second revised plan? Crickets. Petitioners this time have offered no analysis from Dr. Imai. Sometimes what is not said tells more than what is.

{¶ 100} Dr. Imai had also opined that the first revised plan was an outlier when analyzed under four political-science measures of partisan bias—efficiency gap, mean-median gap, partisan symmetry, and declination. Other than partisan symmetry, there is no evidence presented regarding the three other metrics. For example, Dr. Christopher Warshaw's affidavits in support of the first and second sets of objections analyzed the efficiency gap, mean-median gap, and declination of the various plans, but he did not address those metrics at all in his affidavit supporting the third set of objections. It does not require a tremendous leap of logic to infer why this type of evidence is missing today.

{¶ 101} Petitioners point to the plan's partisan asymmetry, contending that some, if not all, of the competitive districts that lean Democratic based on prior election results should be counted as Republican districts. Respondents, on the other hand, point to Dr. Michael Barber's explanation that the commission's second revised plan creates an efficiency gap—the number of "wasted" votes above 50 percent plus 1 that a party receives—that favors Democrats in both chambers of the General Assembly. But nary is there a mention of any of this in the majority opinion. Once again, the majority selectively incorporates only the evidence that can support its chosen outcome.

{¶ 102} Further, in *LWV II*, the majority indicated that the Democratic-leaning districts were too competitive because "a 1 percent swell in Republican vote share would sweep [those] 12 additional districts into the Republican column." ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 40. That no longer applies under the second revised plan, so the majority now asserts that a *5 percent* swing of votes in favor of the Republican Party would result in 23 more Republican seats while an inverse swing would net the Democrats at most two seats. *See* majority opinion at ¶ 33. The majority is simply rewriting the rules as it goes along to create the appearance that its holding stands on law and principle rather than the need to reach a chosen outcome.

### C. *The majority's curious treatment of double bunking*

{¶ 103} There is another aspect of the majority opinion that bears mention. The majority criticizes Senate President Huffman for expressing concern that the

Sykes-Russo plan placed a large number of incumbent Republicans in the same districts as other Republicans but did not do the same for Democratic members.

{¶ 104} The majority is correct that Article XI does not explicitly prohibit double-bunking incumbents in the same district. Yet, contrary to the majority's assumption, courts have recognized that maintaining incumbents in their home districts is a legitimate goal in adopting a district plan. *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *Harper v. Hall*, 2022-NCSC-17, ¶ 170. The practice of protecting incumbents is "neutral" and "time-honored." *See Vieth v. Jubelirer*, 541 U.S. 267, 300, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (lead opinion of Scalia, J.); *see also Rucho*, ___ U.S. at ___, 139 S.Ct. at 2500, 204 L.Ed.2d 931 (protecting incumbents is a "traditional" districting criteria). Incumbency considerations do not evince an intent to favor or disfavor a political party, particularly here because the commission avoided double-bunking incumbents of both parties.

## II. The second revised plan is constitutional

{¶ 105} The majority's conclusion that the second revised plan violates sections 6(A) and 6(B) rests on two faulty premises: (1) that only a plan that is collectively drafted by all seven members of the commission is valid; and (2) that competitive districts with a margin of less than 2 percent should not be counted in Article 6(B)'s proportionality analysis. Both are refuted by the text of the Constitution.

### A. *The plan complies with Article XI, Section 6(A)*

{¶ 106} The majority concludes that because all seven commissioners did not jointly draft the second revised plan, there is a violation of Section 6(A)'s requirement that the commission attempt to draw a plan that is not drawn primarily to favor a political party. But the Constitution specifically authorizes a simple majority of the commission to enact a plan. Sections 8(A) and (C). The second revised plan was enacted by the commission in accordance with all commission rules and all constitutional requirements. Just because the majority does not like the process created by Article XI does not mean that the second revised plan unduly favors the Republican Party.

{¶ 107} Furthermore, it is manifest that the commission drafted the plan to comply with the neutral map-drawing requirements of Sections 2, 3, 4, 5, and 7 as well as its directory duty to achieve partisan proportionality. The evidence simply does not establish that the commission attempted to draw the second revised plan with the primary purpose to favor or disfavor a political party.

{¶ 108} The majority contends that the commission acted primarily to favor Republicans and to disfavor Democrats by drawing a number of "competitive" Democratic-leaning districts without also drawing a proportionate number of "competitive" Republican-leaning districts. But the evidence does not support the majority's implicit assumption that it was possible to comply with the objective map-drawing requirements of Sections 2, 3, 4, 5, and 7 and this court's judge-made rule that the plan must provide proportional representation while also ensuring that all Democratic-leaning districts are essentially safe enough to result in a proportional number of Democratic victories over the life of the plan. No map presented to the commission or to this court has achieved that. And the fact that the commission failed to do the impossible does not prove that it drew the second revised plan primarily to favor or disfavor a political party.

{¶ 109} In fact, it is petitioners who seek a partisan plan. They ask for *less proportionality* and fewer Democratic-leaning districts in order to receive safer, more solidly Democrat districts. They therefore recognize that proportionality and safe Democratic districts are incompatible with Ohio's political geography. But nowhere does Article XI ensure safe seats. With the second revised plan, the commission has gone from Republicans being favored to win 85 House and Senate seats to the Democrats' 47, *see LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 24, to what is currently a perfectly proportional division of districts in a 72-60 split. How is an attempt to create 13 more districts that favor the Democratic Party primarily an attempt to disfavor the Democratic Party?

### B. *The plan complies with Article XI, Section 6(B)*

{¶ 110} Article XI, Section 6(B) directs the commission to draw the plan so that "[t]he statewide proportion of districts whose voters * * * favor each political party * * * correspond[s] closely to the statewide preferences of the voters of

Ohio." The second revised plan contains 54 percent of districts whose voters favor the Republican Party and 46 percent of districts whose voters favor the Democrat Party. Thus, it corresponds exactly to the statewide preferences of the voters of Ohio.

{¶ 111} Nowhere does Article XI guarantee symmetry such that both political parties have the same number of "safe" seats and the same number of "competitive" seats. Instead, Article XI, Section 6(B) directs the commission to attempt to draw a map that includes districts that "favor" a party in close correspondence to the preferences of Ohio voters. This is exactly what the commission did here.

{¶ 112} Once the majority's faulty premises are stripped away, there is no basis on which to sustain petitioners' objections. We would overrule the objections and sustain the constitutionality of the second revised plan.

### III. It did not have to be this way

{¶ 113} Fair to say, the majority's decision creates chaos. With the primary election set to occur in less than two months, voters, candidates, and election officials remain in the dark about Ohio's legislative-district lines. The majority attempts to shift the blame for that to the commission, but had the majority simply followed the text of the Constitution and respected the limits to this court's power, none of this would be happening. To explain why, we need to take a step away from the process that has been followed by the majority and outline the process that is actually laid out in the Constitution.

### A. *Background: Article XI*

{¶ 114} Article XI of the Ohio Constitution controls who draws a General Assembly–district plan, establishes subjective and objective map-drawing requirements, prescribes the length of time a district plan may last, and authorizes but limits judicial review. For a more detailed analysis of these provisions, *see LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 193-200 (Kennedy, J., dissenting).

{¶ 115} The subjective map-drawing requirements include the standards that the members of the commission keep in mind when drawing a plan. The

requirements of Section 6 relating to an attempt to create proportional districts and districts that do not primarily favor a political party are examples of these subjective requirements. On the other hand, compliance with the objective map-drawing requirements presents essentially a factual question for this court—it can be determined on the face of the plan.

{¶ 116} Section 1 establishes the redistricting commission and provides the procedures it must follow. Sections 2, 3, 4, 5, and 7 are the objective map-drawing requirements, which the commission *shall* apply. Section 2 establishes the number of legislators per district. Section 3 sets forth the population and line-drawing rules for all districts and the composition and numbering of House districts, and Section 4 prescribes the composition and numbering of Senate districts. Section 5 regulates district boundaries for senators who have unexpired terms, and Section 7 establishes the governmental-unit boundaries to be used.

{¶ 117} When a plan is adopted by a bipartisan vote including at least two members from each of the two largest political parties, the plan lasts for ten years, unless it is invalidated by this court or a federal court. Article XI, Sections 1(B)(3), 3(A), and 8(B). When commissioners fail to adopt a plan by a bipartisan vote, Section 8 provides an impasse procedure under which the commission may adopt a plan by a simple majority vote that lasts only four years.

{¶ 118} When a plan is challenged in this court, our authority to review the plan is limited. Section 9(D)(3) requires a predicate violation of the objective map-drawing requirements of Section 2, 3, 4, 5, or 7 before this court may invalidate a plan. The determination whether a plan is invalid or may be amended by the commission depends on whether the violation or violations of Section 2, 3, 4, 5, or 7 are isolated, Section 9(D)(3)(a), or more widespread, Section 9(D)(3)(b), or significant and material, Section 9(D)(3)(c).

{¶ 119} Theis entire General Assembly–redistricting process is displayed in the following flowchart:



Section 1: The commission convenes, introduces a plan, holds 3 public hearings, and adopts a plan.

Section 1(C): Was the plan adopted by a *bipartisan* vote by September 1?

No

Section 8(A)(3): The impasse procedure applies. The commission introduces a plan, holds a public hearing, and must adopt a plan by September 15.

Yes

Section 8(C)(1)(a): The plan stays in effect for 4 years.

No — Was the plan adopted by a *bipartisan* vote? — Yes

The plan remains in effect for 10 years.

Section 9(A): Is a challenge to the plan brought in the Ohio Supreme Court?

Yes

No — The plan remains in effect until the next redistricting.

Section 9(D): Does the plan violate Section 2, 3, 4, 5, or 7?

Yes

Was the map adopted under the impasse procedure in Section 8(C)?

No

Yes

Section 9(D)(3)(b): Do the violations require amending 6 or less House districts or 2 or less Senate districts?

No — Section 9(D)(3)(c): Does the plan contain significant violations materially affecting the ability of the plan to provide proportional representation AND does the proportion of districts not correspond closely to the statewide preferences of Ohio voters?

Yes

No

Yes

Section 9(D)(3)(a): The court orders the commission to amend the plan to correct the isolated violations.

Section 9(D)(3)(b) or (c): The court invalidates the plan and orders the commission to adopt a new one in accordance with Article XI.

**The Redistricting Procedure Established by Article XI of the Ohio Constitution**

Section 9(B): The commission is reconstituted and reconvenes.

### B. The majority mischaracterizes Article XI

{¶ 120} The second revised plan was adopted along party lines. Such a plan takes effect upon its filing with the secretary of state. Article XI, Section 8(C)(1)(a). Section 9(A) vests this court with "exclusive, original jurisdiction in all cases arising under this [Article XI]," but that grant of power is limited.

{¶ 121} Although Section 9(A) is a general statement that this court is the proper forum to hear a challenge to a General Assembly–district plan, Section 9(D) is a more specific provision that sets out the limits of our review. Section 9(D)(1) prohibits this court from ordering "the implementation or enforcement of any general assembly district plan that has not been approved by the commission in the manner prescribed by [Article XI]." Section 9(D)(2) forbids this court from "order[ing] the commission to adopt a particular general assembly district plan or to draw a particular district." And Section 9(D)(3) provides that certain remedies are available if a plan is both *adopted by the commission* and "does not comply with the requirements of [Article XI,] Section 2, 3, 4, 5, or 7." (Emphasis added.)

{¶ 122} For "isolated violations of those requirements," Section 9(D)(3)(a) requires this court to order the commission to amend the plan to remedy the violations. When the violations require the commission to amend at least six House districts or at least two Senate districts, Section 9(D)(3)(b) directs this court to wholly invalidate the plan. Finally, Section 9(D)(3)(c) permits this court to invalidate a plan adopted under Section 8(C) if the plan significantly violates Section 2, 3, 4, 5, or 7 in a manner that materially affects the ability of the plan to provide proportional representation and the statewide proportion of districts does not correspond closely to the statewide preferences of Ohio voters.

{¶ 123} Therefore, this court's power to invalidate a plan, in whole or in part, expressly depends on the existence of a predicate violation of Section 2, 3, 4, 5, or 7. The majority, however, has never held that any of the plans adopted by the commission in these cases violated those provisions. *See generally LWV II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___; *LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___N.E.3d ___.

{¶ 124} Tellingly, the majority makes no attempt to ground its exercise of judicial review in any provision of the Constitution. Although the majority previously asserted that Article XI, Section 9(B) grants the court the power to invalidate a plan based on a stand-alone violation of Section 6 or *for any reason*, *see LWV I* at ¶ 98, it makes no mention of Section 9(B) today. But if that means the majority has had the epiphany that Section 9(B) does not provide the far-ranging authority it previously claimed, it does not say so.

{¶ 125} In any event, because Section 9(B) does not address the authority of this court to do anything, it cannot be a source of judicial power. Section 9(B) states:

> In the event that any section of this constitution relating to redistricting, any general assembly district plan made by the Ohio redistricting commission, or any district is determined to be invalid by an unappealed final order of a court of competent jurisdiction then, notwithstanding any other provisions of this constitution, the commission shall be reconstituted as provided in Section 1 of this article, convene, and ascertain and determine a general assembly district plan in conformity with such provisions of this constitution as are then valid, including establishing terms of office and election of members of the general assembly from districts designated in the plan, to be used until the next time for redistricting under this article in conformity with such provisions of this constitution as are then valid.

{¶ 126} Reduced to its essentials, Section 9(B) says: "In the event that * * * any general assembly district plan * * * is determined to be invalid by * * * a court of competent jurisdiction[,] then * * * the commission shall be reconstituted * * * and determine a general assembly district plan * * * to be used until the next time for redistricting." Or put more simply, the commission shall be reconstituted and must adopt a new plan if its old plan is invalidated by a court.

{¶ 127} Elementary rules of grammar demonstrate that the commission, not this court, is the subject of Section 9(B). A simple sentence diagram shows this:



{¶ 128} Because *the commission* is the subject of Section 9(B), that provision grants the commission the enumerated power to be reconstituted should a plan be invalidated. Section 9(B) does not provide this court with any enumerated power at all, because this court is not a subject of the provision.

{¶ 129} If the opening clause of Section 9(B) is not an enumerated power giving this court authority to act, then what does the opening clause do? As is common with legal instruments, the opening clause serves as a condition precedent as to when the commission is reconstituted. In the law, a condition precedent is something that must occur before something else can happen. *Black's Law Dictionary* 366-367 (11th Ed.2019) (defining "condition precedent" as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises"). The phrase "in the event that" is a "linguistic convention[]" used "to create conditions precedent." *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir.2008); *see also United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 244, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987), fn. 5.

{¶ 130} Again, Section 9(B) states, "In the event that any section of this constitution relating to redistricting, any general assembly district plan made by the Ohio redistricting commission, or any district is determined to be invalid by an unappealed final order of a court of competent jurisdiction then, notwithstanding any other provisions of this constitution, the commission shall be reconstituted * * *." Therefore, the power enumerated is for the commission to reconstitute, but

only if a court of competent jurisdiction has first invalidated any section of Article XI or any district plan or any district.

{¶ 131} Because Section 9(B) does not speak to what this court may or may not do, it does not grant this court any power to declare a district plan invalid based on a stand-alone violation of Section 6. Rather,

> the negative implication of Article XI, Section 9 is obvious. Section 9(D) is a provision that limits the authority of this court in reviewing a General Assembly–district plan. It prohibits this court from ordering the commission to adopt a specific plan and from drawing the districts ourselves. And that same provision provides that this court may invalidate a General Assembly–district plan in whole or in part only if we first find a violation of Article XI, Section 2, 3, 4, 5, or 7.

*LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___N.E.3d ___, at ¶ 227 (Kennedy, J., dissenting).

{¶ 132} Indeed, "[i]f violations of Section 6 were intended to be actionable, one would naturally expect Section 9(D) to say so. But that language is conspicuously absent." *Id.* at ¶ 217 (Kennedy, J., dissenting). The exclusion of Section 6 from the remedies expressly provided by Section 9(D)(3) demonstrates that any remedy for such violations is not judicially enforceable—the inclusion of Sections 2, 3, 4, 5, and 7 within the provision shows that Section 6 was intentionally excluded from it. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). For this reason, "the standards established by Article XI, Section 6 are directory and therefore not judicially enforceable." *LWV I* at ¶ 245 (Kennedy, J., dissenting).

{¶ 133} But this raises the question why. Why would Section 9(D) enumerate the power of judicial review for violations of Section 2, 3, 4, 5, or 7 but not for Section 1 or 6? The answer to this question is obvious. The Ohio Constitution limits this court's review of a district plan to alleged violations of the

objective map-drawing requirements. Because the subjective standards turn on the perception of each member of this court, few principles can be identified to guide and confine the court's review of them. Compliance with the standards set forth in Section 6 is solely a matter of degree: Has a sufficient attempt been made? Does the proportionality of representation correspond *closely enough* to voter preferences? Is a district compact enough? Such questions require this court to determine what the commission was thinking when it was adopting a plan. But how can a court know this? Is the court supposed to examine evidence as to the collective thinking of the whole commission, a majority of the members of the commission, or each member of the commission? Indeed, one need look no further than the concurring opinion's endorsement of Section 6 as a standardless opportunity for judicial "discretion in analyzing a district plan," concurring opinion, ¶ 58, to understand the dangers the amendment's architects sought to avoid in making only violations of the objective requirements reviewable. Removing subjectivity from the equation and relying on purely objective measures affords the voters of Ohio the promise of Article XI: an end to gerrymandering.

{¶ 134} In contrast to the wholly subjective standards of Section 6—which prohibit the plan from having a primary purpose of partisan favoritism and requires compact districts and close correspondence with the preferences of Ohio voters— the judicially enforceable requirements of Sections 2, 3, 4, 5, and 7 are objective in nature. Violations of Sections 2, 3, 4, 5, and 7 are readily observable—with the right software, anyone can see those violations. The population requirements either are met or they are not. The same is true regarding the order in which the districts are drawn and the number of divisions of governmental units. Compliance with these objective map-drawing requirements can be proved by evidence and decided by a court.

{¶ 135} So, with precision, the amendments to Article XI denied this court the power to invalidate a plan based solely on the court's subjective view of a violation of Section 1 or 6. As Justice Felix Frankfurter once observed, "when the Constitution * * * gives strict definition of power or specific limitations upon it we cannot extend the definition or remove the translation. Precisely because 'it is a

constitution we are expounding,'; we ought not to take liberties with it." *Natl. Mut. Ins. Co. of Dist. of Columbia v. Tidewater Transfer Co.*, 337 U.S. 582, 646-647, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting), quoting *McCulloch v. Maryland*, 17 U.S. 316, 407, 4 L.Ed. 579 (1819).

{¶ 136} The careful calculus embodied within Article XI imposes mandatory requirements on the commission in Sections 2, 3, 4, 5, and 7 that justify this court's invalidating a plan if the objective measures are not met. It also directs the commission in Sections 1 and 6 to follow certain procedures and standards in adopting a plan while also appealing to each commissioner's oath to uphold the Ohio Constitution, to discourage partisan favoritism and encourage proportional representation in the plan. But Article XI's plain terms do not make these directory requirements, which involve considerations best left to the political branches of our government, enforceable by this court, a forum in which politics may not intrude. Article XI does this by expressly enumerating this court's power to invalidate a plan only when Section 2, 3, 4, 5, or 7 has been violated; by failing to enumerate such a power for this court to enforce compliance with Section 1 or 6, the architects of Article XI necessarily imposed a limit beyond which this court may not cross. The majority today, as in its previous decisions in these cases, has utterly failed to justify its exercise of power expressly withheld.

## C. The unfulfilled promise of Article XI

{¶ 137} Rather than follow the process established by the Ohio Constitution (as depicted in the simple flowchart above), the majority creates a new remedy to invalidate a plan for failing to comply with Article XI, Section 6 or *for any other reason*. Unmoored from the plain language of the Ohio Constitution or any basic notions of judicial restraint, the majority has injected needless uncertainty and confusion into the 2022 election cycle. By distorting and misrepresenting the plain language of Article XI, Section 9(B), the majority has empowered itself to use a judicially unenforceable provision to strike down any district plan that the commission adopts. The result of this standardless judging is the application of ad hoc rules to usurp the authority of an independent constitutional body, with the

ultimate goal of forcing the commission to eventually adopt the plan that the majority has in mind.

{¶ 138} It did not have to be this way. The official ballot language for Issue 1, the 2015 proposed constitutional amendment to Article XI, reflected that the threat of a four-year plan was meant to foster bipartisanship; the ballot language stated that Article XI would "prevent deadlock by limiting the length of time any plan adopted without bipartisan support is effective." Ballot Board: 2015, Ballot Issues for the 2015 November Election, Issue 1, Ballot Language, available at https://www.ohiosos.gov/legislation-and-ballot-issues/ballot-board/ballot-board-2015/ (accessed Jan. 10, 2022) [https://perma.cc/ZP9U-VN86]. "The apparent hope was that the uncertainties and electoral vagaries that come with a four-year plan would motivate political actors to reach a consensus." *LWV I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 235 (Kennedy, J., dissenting).

{¶ 139} The people were led to believe that Issue 1 would create a bipartisan process that would yield more competitive elections within more compact House and Senate districts, that the process would be public, and that any deadlock over a district plan would be prevented by limiting the life of a plan adopted along party lines to four years.

{¶ 140} Contemporary media accounts heralded the four-year-plan impasse procedure as a key element of the proposed amendment, in that the consequence of the failure to attain bipartisan agreement on a ten-year plan would be a partisan plan limited to four years.

> Issue 1's key reform is that for an 'apportionment' (legislative map) to apply, as now, for 10 years, at least two minority party Redistricting commissioners would have to support it. Otherwise, the map would only apply for four years.
>
> No coincidence, Ohio elects governors, auditors and secretaries of state every four years. So: A Redistricting Commission majority that refused to bargain with a Redistricting Commission minority to approve a 10-year map might find itself the

commission's new minority in four years—when new General Assembly districts would have to be drawn. That is, Issue 1 would tie carrots to sticks to encourage bipartisan district-drawing.

Suddes, *State Issue 1 an opportunity for Democrats*, Dayton Daily News (July 19, 2015). Senate President Huffman, a state representative at the time, said: " 'This system basically says we are going to have a system that you now have an incentive to take in account what the minority party wants. * * * If there's a chance your district may change four years from now, that is bad. There's value in a 10-year map as proposed to a four-year map. * * * All the people sitting at the table now have an incentive to compromise.' " Sowinski, *Huffman gives sales pitch for redistricting in Ohio*, Lima News (Aug. 29, 2015).

{¶ 141} The voters understood that the proposed amendment included a process geared toward bipartisan agreement and that it contained an alternative with a real political cost—a plan passed on a partisan basis would last only four years and be subject to revision by a reconstituted redistricting commission with new members, possibly of a different political party. The hedge against partisanship, then, was the limitation of a partisan plan to four years. But because of the majority's activist decision to substitute itself for the commission in Article XI's redistricting process, one has to ask: Will the people ever realize the promise of what they adopted?

{¶ 142} What was not contemplated when Article XI was adopted was that this court would ignore the plain text of the Constitution and seize control of the map-drawing process. Yet that is what the majority has done, tearing down the goalposts it erected in *LWV I* and *LWV II*.

{¶ 143} The majority hoists the blame for the looming constitutional crisis on the commission, but that is simply a diversion. The blame falls solely with the four justices in the majority today. The majority has thrust the court into this political process and wreaked havoc. It has usurped the sovereignty the people exercised in adopting Article XI and has seized the commission's powers as its own.

### IV. Conclusion

{¶ 144} The majority's decree today is an exercise of raw political power. Nothing less. Nothing more.

{¶ 145} The Constitution limits this court's authority to order the commission to adopt a new plan, but the majority ignores this limitation. The majority invalidates a plan that complies with all constitutional requirements. And now that the commission has met the extraconstitutional guidelines announced by the majority in this court's previous decisions, the majority finds those efforts insufficient. The goalposts that the majority erected in *League I*, and moved in *League II*, have now been torn down entirely.

{¶ 146} The majority demands a new plan but provides precious little guidance on how that is to be achieved. An imminent election is thrown into disarray and Ohio nears a constitutional crisis, but the majority offers the commission only standardless judging and a vague admonition to try again.

{¶ 147} In so doing, the majority proves prescient Thomas Jefferson's fear that the Constitution would be "a mere thing of wax in the hands of the judiciary, which they may twist, and shape into any form they please." 12 *The Works of Thomas Jefferson* 137 (P. Ford Ed.1905). We disagree that fundamental law is so malleable.

{¶ 148} Because the majority does not exercise authority granted to it by the Ohio Constitution but instead nakedly wields the judicial power, we dissent.

FISCHER, J., concurs in paragraphs 138-143 of the foregoing opinion.

––––––––––––––––––

**FISCHER, J., dissenting.**

{¶ 149} I must respectfully dissent.

{¶ 150} As stated in my previous dissents in these cases, I would not reach the merits of petitioners' objections. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 279 ("*League I*") (Fischer, J., dissenting); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, ¶ 149

("*League II*") (Fischer, J., dissenting).  The majority opinion here represents a third attempt at exercising authority not granted to this court by the Ohio Constitution.

{¶ 151} Ohio now finds itself stuck in the hole dug by the majority opinions in *League I* and *League II*.  As I have explained before, if this court had followed the clear language of the Ohio Constitution, the original plan adopted by respondent Ohio Redistricting Commission would already be in effect for four years under Article XI, Section 8(C)(1)(a) of the Ohio Constitution.  *See League I* at ¶ 314 (Fischer, J., dissenting).  Ohioans would have constitutionally mandated certainty regarding which districts they live in and when their elections would take place.  And both Ohioans and the members of the redistricting commission would have had four years within which to learn from the impasse reached by the commission in 2021 and work toward a better outcome when the commission reconvened in 2025 under Article XI, Section 8(D).  If this court had correctly applied Section 8(C)(1)(a) from the beginning, we would not find ourselves in the situation we are in now.

{¶ 152} I still believe that it is improper for this court to consider the merits of petitioners' objections in these cases.  But because the majority opinion considers the merits of the objections, I am forced to do so as well.

## I.  Article XI, Sections 6(A) and 6(B)

{¶ 153} In addressing the merits of petitioners' arguments, I would conclude that petitioners have not shown beyond a reasonable doubt that the second revised General Assembly–district plan violates Article XI, Section 6(A) or 6(B).  In fact, petitioners' proof does not even meet the lower standard of clear and convincing evidence.  I would accordingly overrule the objections.

{¶ 154} Petitioners must prove that the second revised plan is unconstitutional beyond a reasonable doubt.  *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 339-340 (Fischer, J., dissenting), citing *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 20.  In this situation, the presumption of constitutional validity applies.  *Id.* at ¶ 340, citing *Wilson* at ¶ 21.  While the majority opinion cites this standard, it does not actually apply it.

{¶ 155} As noted in *League II*, Article XI, Section 6 does not require parity in terms of each political party's vote share in each district or prohibit the creation of competitive districts. *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 40, 62. The main constitutional flaw identified by the *League II* majority opinion regarding the first revised plan was the large number of districts "favoring" the Democratic Party by less than one percentage point. *Id*. at ¶ 40, 62-63. The majority opinion determined that the high number of virtual-tie districts that had been designated Democratic-leaning was "demonstrative of an intent to favor the Republican Party." *Id.* at ¶ 40.

{¶ 156} Petitioners want this court to apply that reasoning from *League II* but to shift the threshold for what amounts to a "toss-up" district from 51 percent to 52 percent. In other words, they want more Democratic-leaning districts that have a vote share of more than 52 percent, even if strict proportionality is thereby sacrificed.

{¶ 157} As noted in the majority opinion, counsel for some of the petitioners in these cases submitted to the commission an updated version of a proposed General Assembly–district plan created by Dr. Jonathan Rodden (the "Rodden III plan"). Tellingly, even if this court were to assume that the Rodden III plan otherwise complies with Article XI, its composition of additional "safe" Democratic districts is not evidence that the second revised plan violates Article XI, Section 6(A). The fact that the commission tried to attain strict proportionality—instead of a less proportional plan that includes more "safe" Democratic-leaning districts—does not, nor could it, show a primary intent to favor Republicans or disfavor Democrats. Rather, it appears that the commission's primary intent was to comply with *League I* and *League II*.

{¶ 158} Moreover, the evidence before this court points to the realities of Ohio's political geography as being a factor in the commission's allocation of so-called "safe" and "competitive" seats under the second revised plan. All the parties have agreed that Ohio's political geography makes it difficult to create Democratic-leaning districts in many areas of the state. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 127-128. Indeed, in none of the plans discussed by

the parties—i.e., the second revised plan, the Rodden III plan, or the plan submitted by respondent Senator Vernon Sykes and respondent House Minority Leader Allison Russo (the "Sykes-Russo plan")—is the distribution of the margins for winning a seat "symmetrical." All the plans have considerably more Republican-leaning than Democratic-leaning districts in which the majority political party's vote share is 55 percent or more.

{¶ 159} Even in the Rodden III plan, which contains the most total House and Senate districts with Democratic vote shares of 55 percent or higher, there are only 40 such Democratic-leaning districts—as opposed to the 66 such Republican-leaning districts (i.e., 50 percent of the General Assembly) in that plan. As noted by Dr. Michael Barber, a Brigham Young University political-science professor (with expertise in advanced statistical methods for analyzing election data) whose expert testimony was submitted by respondents President of the Senate Matthew Huffman and Speaker of the House Robert Cupp, "[t]his is a function of Democratic voters in the state being densely clustered in homogenous precincts in the largest cities of the state while Republican voters are more scattered throughout the state in more heterogeneous districts."

{¶ 160} Further cutting against petitioners' objections is the fact that their proposed 52-percent-vote-share benchmark is not grounded anywhere in the Ohio Constitution. In *League II*, the majority opinion improperly called it "absurd" to label districts with a Democratic vote share between 50 and 51 percent as "Democratic-leaning," particularly because the first revised plan contained no districts with a similarly slim Republican leaning. *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 61. But the majority opinion in *League II* did not identify a threshold for labeling a district as a "toss-up." It stated only that when a redistricting plan contains a large number of districts whose voters "favor" Democrats at a vote share between 50 and 51 percent and contains no districts that favor Republicans at such a razor-thin margin, the plan shows evidence of having been intentionally drawn with partisan bias. *Id.* at ¶ 40. The mere existence of numerous closely competitive Democratic-leaning districts in the second revised

plan, however, does not necessarily show that the second revised plan was drawn primarily to favor or disfavor a particular political party.

{¶ 161} In addition, other factors that led to the invalidation of the previous plans in *League I* and *League II* are not present here. In both *League I* and *League II*, the majority opinions relied on statistical evidence submitted by Dr. Kosuke Imai (a professor in Harvard University's departments of government and of statistics who has expertise in developing simulation algorithms for evaluating legislative redistricting) showing that the plans were statistical outliers that favored the Republican party more than in any of the 5,000 simulated plans that he had generated. *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 122-126; *League II* at ¶ 43-44. .

{¶ 162} This time, petitioners have offered no such analysis from Dr. Imai or any other similar expert. Dr. Imai had also opined that the first revised plan was an outlier when analyzed under four so-called political-science metrics for measuring partisan bias—efficiency gap, mean-median gap, partisan symmetry, and declination. Conspicuously absent this time is any evidence relating to these metrics, other than that of partisan symmetry, which is discussed below. This is significant because *respondents* have submitted evidence showing that one of the partisan-bias measures—the efficiency-gap analysis—shows that the second revised plan's bias toward the Republican Party is actually slight or nonexistent. Dr. Barber noted:

> Using the 9 statewide elections [from 2016-2020, as used by the commission], the third Commission map has an efficiency gap value of 2.43%, which indicates a slight bias in the direction of the Democratic Party. The Rodden III plan has an efficiency gap value of -1.13%, which indicates a slight bias in the direction of the Republican Party. The Sykes Russo plan has an efficiency gap value of 0.38%, which indicates a very small bias in the direction of the [Democratic] Party. Overall, all of these numbers are small and indicate relative balance between the parties.

Dr. Barber also noted that regarding the Senate map in the second revised plan, the efficiency-gap value is similar to that for the Rodden III and Sykes-Russo plans, with all three plans indicating "relative balance between the parties."

{¶ 163} The evidence of partisan asymmetry in the second revised plan is weaker than it was for the plans at issue in *League I* and *League II*. Dr. Michael Latner, a professor of political science at California Polytechnic State University with expertise in electoral-system design and statistical methods in elections and in designing electoral districts, concludes that Democrats could expect to win approximately 44 percent of the House seats (approximately 44 seats) under the second revised plan if they won 50 percent of the statewide vote whereas Republicans could expect to win approximately 53 percent of the seats (approximately 52 seats) if they won 50 percent of the statewide vote. Similarly, Dr. Latner opines that Democrats could expect to win 45 percent of the Senate seats (approximately 15 seats) if they won 50 percent of the statewide vote whereas Republicans could expect to win 52 percent of the seats (approximately 17 seats) if they won 50 percent of the statewide vote. This is evidence of possible partisan asymmetry, to be sure. But Dr. Latner's analysis also shows that the second revised plan significantly improved on the first two plans. Indeed, Dr. Latner concludes that the partisan-symmetry indexes for the second revised plan are closer to those of the Rodden III plan than the commission's first two plans.

{¶ 164} Another factor that guided the majority opinions in *League I* and *League II* in their evaluations (and invalidations) of the previous plans was that "an alternative, more proportional plan" was possible. *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 45-47; *see also League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 126. That factor does not support petitioners' objections here. *The second revised plan, at least on its face, is strictly proportional to the statewide preferences of Ohio voters*. Instead of pushing for a more proportional plan, petitioners now ask this court to invalidate the second revised plan because there are alternative plans that do not contain as many competitive Democratic-leaning districts (i.e., districts with a Democratic vote share of less than

52 percent). I do not find this argument persuasive, because it has no grounding in either the Ohio Constitution or the previous majority opinions in *League I* and *League II*, which were concerned that there existed alternative plans that *were closer to strict proportionality*. Now that the commission has come close to achieving strict proportionality—while minimizing Democratic-leaning districts with vote shares of less than 51 percent—the evidence regarding alternative plans is much less probative of any partisan bias.

{¶ 165} As the commission argues, petitioners' objections to the second revised plan essentially ask this court to compel the commission to adopt a plan in which there are "fewer Democratic-leaning seats, [with] the remaining Democratic-leaning seats be[ing] less competitive." But the Ohio Constitution does not compel the commission to eliminate competitive districts, and it "does not require exact parity in terms of the vote share of each district." *League II* at ¶ 40. Article XI, Section 6(A) requires that the commission not draw a plan *primarily* to favor or disfavor a political party. For the reasons stated above, I would find that petitioners have not proved beyond a reasonable doubt, which is unquestionably the standard of review in these cases, *see* majority opinion at ¶ 23, that the commission adopted the second revised plan primarily to favor Republicans or to disfavor Democrats.

{¶ 166} The Article XI, Section 8(C)(2) statement for the second revised plan indicates that the plan contains 54 Republican-leaning House districts, 45 Democratic-leaning House districts, 18 Republican-leaning Senate districts, and 15 Democratic-leaning Senate districts—for a total of 72 Republican-leaning districts and 60 Democratic-leaning districts. This equals a 54.5 percent Republican seat share and a 45.5 percent Democratic seat share across the entire plan. Those numbers, if credited, surely correspond closely to the statewide preferences of Ohio's voters, which the majority opinion in *League I* identified as about 54 percent favoring Republicans and about 46 percent favoring Democrats. *League I* at ¶ 108.

{¶ 167} One of the main issues as to the first revised plan's constitutionality identified in the majority opinion in *League II* was the disparity between the number of barely-Democratic-leaning House districts (12) and the number of barely-Republican-leaning House districts (zero). *See League II*, ___ Ohio St.3d ___,

2022-Ohio-342, ___ N.E.3d ___, at ¶ 61 (referring to "very close 'toss-up districts' "). But what that majority opinion failed to define, and what this court should not and may not define under Article XI, is the outside limit of what makes a district a "toss-up" or "competitive." It did not need to do so in *League II*, as it found the 12 districts at issue to be "surely" competitive "under any measure." *Id*. at ¶ 62. The "competitive" districts under the plan at issue in *League II* had Democratic vote shares between 50 and 51 percent—in fact, nine had vote shares between 50 and 50.5 percent. *Id*. at ¶ 57. By contrast, the majority opinion specifically identified a Republican-leaning district with a vote share of 52.6 percent, yet it did not count that district as "competitive." *Id*.

{¶ 168} The majority opinion in *League II* made clear that Article XI does not prohibit competitive districts, *id*. at ¶ 62, and "does not require exact parity in terms of the vote share of each district," *id*. at ¶ 47. So neither the bare existence of "competitive" districts—however that term is defined—nor the mere existence of minimal asymmetry in the partisan vote shares between the political parties' districts indicates that the second revised plan violates Article XI, Section 6(B).

{¶ 169} If this court is to be consistent with *League II*, it must exclude the districts with vote shares of under 51 percent from the proportionality assessment. The question is whether the districts with vote shares between 51 and 52 percent must be excluded as well.

{¶ 170} Obviously, at a certain level of partisan support, any concern over the commission's designating "competitive" districts as ones that "favor" a party falls away, even if there remains a large disparity in the vote shares of each party's districts. For example, if all the Republican districts in a plan favored Republicans by 90 percent but all the Democratic districts in the plan favored Democrats by "only" 65 percent, the vote share would still be quite disparate, but it would be absurd to say that the Democratic districts did not truly "favor" Democrats. Whether a vote share between 51 and 52 percent is sufficient to eliminate the *League II* majority opinion's concerns about any disparate application of the "favor" provision is an issue for which the Constitution provides no guidance.

{¶ 171} This lack of constitutional guidance about what makes a district "competitive" militates strongly in favor of judicial restraint: this court should conclude that the commission deserves the leeway that we give to the promulgator of any legislative act. *See State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 73; *Wilson*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, at ¶ 48. Here, the majority opinion leaves unclear when a district ceases to be "competitive" and thus counts toward the proportionality determination. In my view, we have passed that point and must now exercise proper judicial restraint. Accordingly, I would conclude that the districts with vote shares between 51 and 52 percent must not be excluded from this court's proportionality analysis.

{¶ 172} Moreover, respondents have identified various reasons that explain why the second revised plan includes so many districts with Democratic vote shares between 51 and 52 percent. For instance, as a matter of simple logic, moving Republican voters out of one district in the plan to make the district more favorable to Democrats naturally makes the surrounding districts more favorable to Republicans.

{¶ 173} Also militating in favor of judicial restraint is the fact that the alternative plans favored by petitioners and Senator Sykes and House Minority Leader Russo contain a disparate allocation of districts with less than a 53 percent vote share (although the alternative plans do contain fewer Democratic districts with less than a 53 percent vote share than the second revised plan contains). Specifically, the second revised plan has 29 total House and Senate districts with Democratic vote shares between 50 and 53 percent but only one Republican district within that range; the Rodden III plan has 14 total House and Senate districts with Democratic vote shares between 50 and 53 percent but only 4 Republican districts within that range; and the Sykes-Russo plan has 14 total House and Senate districts with Democratic vote shares between 50 and 53 percent but only 2 Republican districts within that range. Maybe the commission could have done a better job under this particular metric. (Senate President Huffman and House Speaker Cupp have argued, without citing any evidence, that doing better on this metric would

negatively impact district compactness, another goal the commission is required to attempt to achieve under Article XI, Section 6(C).) But it also is clear that the problem of disparate allocation of competitive districts is unlikely to go away entirely.

{¶ 174} In sum, the key to the majority opinion's Article XI, Section 6(B) analysis in *League II* was the commission's counting a significant number of districts as favoring Democrats that did not actually "favor" them because the districts were "toss-ups"—and there were no comparable districts in the Republican column. With respect to the districts with vote shares between 50 and 52 percent in the second revised plan, the *disparity* in distribution remains—there are no comparable Republican districts. But by expanding the meaning of "very close 'toss-up districts' " as that term was used in *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 61 (vote share between 50 and 51 percent) to include districts with vote shares between 51 and 52 percent, the majority opinion moves into uncharted constitutional waters. I heartily disagree with that type of approach because it takes this court out of its judicial role and puts it in a legislative one.

{¶ 175} If we exclude from consideration only the House and Senate districts with between 50 and 51 percent vote shares in the second revised plan, the plan would have a total of 57.6 percent Republican districts and 42.4 percent Democratic districts. Given this breakdown, I would conclude that petitioners have not shown beyond a reasonable doubt that the commission did not attempt to draft a plan that closely corresponds to the statewide preferences of Ohio's voters. Given the fact that the alternative plans are *less* proportional than the second revised plan, this is a hard showing for petitioners to make. I would conclude that they have failed to meet their burden, as a breakdown of 57.6 percent Republican districts and 42.4 percent Democratic districts corresponds closely to the statewide preferences of Ohio's voters based on the record before this court.

{¶ 176} I also disagree with the majority opinion's criticism of Senate President Huffman's concern for protecting incumbents. *See* majority opinion at ¶ 36. The Supreme Court of the United States established long ago that "avoiding

contests between incumbent[s]" is a "legitimate objective[]" in redistricting. *Karcher v. Daggett*, 462, U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). With this principle in mind, it is improper to criticize Senate President Huffman for voicing a concern that a plan might prevent the commission from attaining a constitutionally legitimate objective.

{¶ 177} I would conclude that petitioners have failed to prove beyond a reasonable doubt that the commission violated Article XI, Section 6. In concluding otherwise, the majority opinion eschews the principle of judicial restraint and opts instead to take an active role in the redistricting process. Such an approach has no basis in the Ohio Constitution and encroaches on the discretion of the commission, which has the sole constitutional authority to draft district plans. I would overrule petitioners' objections because they do not have a firm basis under the Ohio Constitution or *League II*.

## II. Article XI, Section 1(C)

{¶ 178} The petitioners in *Bennett v. Ohio Redistricting Comm.* argue that the commission also violated Article XI, Section 1(C), which provides:

> At the first meeting of the commission, which the governor shall convene only in a year ending in the numeral one, except as provided in Sections 8 and 9 of this article and in Sections 1 and 3 of Article XIX of this constitution, the commission shall set a schedule for the adoption of procedural rules for the operation of the commission.
>
> The commission shall release to the public a proposed general assembly district plan for the boundaries for each of the ninety-nine house of representatives districts and the thirty-three senate districts. The commission shall draft the proposed plan in the manner prescribed in this article. Before adopting, but after introducing, a proposed plan, the commission shall conduct a minimum of three public hearings across the state to present the proposed plan and shall seek public input regarding the proposed

plan.  All meetings of the commission shall be open to the public.  Meetings shall be broadcast by electronic means of transmission using a medium readily accessible by the general public.

The commission shall adopt a final general assembly district plan not later than the first day of September of a year ending in the numeral one.  After the commission adopts a final plan, the commission shall promptly file the plan with the secretary of state.  Upon filing with the secretary of state, the plan shall become effective.

Four weeks after the adoption of a general assembly district plan or a congressional district plan, whichever is later, the commission shall be automatically dissolved.

{¶ 179} The majority opinion purports to avoid reaching the argument that the commission violated Article XI, Section 1(C).  However, in analyzing petitioners' claims under Article XI, Section 6, the majority opinion faults the commission for failing to comply with Article XI, Section 1(C).  Given the majority opinion's determination in that regard and the fact that the *Bennett* petitioners assert Article XI, Section 1 claims, I find it necessary to address those claims now.

{¶ 180} The *Bennett* petitioners focus on the notice and public-hearing requirements in the second paragraph of Section 1(C), which, they argue, required the commission to release a proposed plan and hold three public hearings before adopting the second revised plan.  But the second paragraph of Section 1(C) may not be read in isolation.  *See State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 12.  And Article XI, Section 1(C)'s third paragraph suggests a much narrower meaning of the second paragraph—i.e., that a proposal must be released and three public hearings must be held *before* September 1 of a year ending in the numeral one.  When Section 1(C) is read as a whole, it is clear that the procedural requirements in its second paragraph do not apply once the commission has missed the September 1 deadline.

{¶ 181} Article XI, Section 8(A) confirms that reading. Section 8(A) provides:

> (1) If the Ohio redistricting commission fails to adopt a final general assembly district plan not later than the first day of September of a year ending in the numeral one, in accordance with Section 1 of this article, the commission shall introduce a proposed general assembly district plan by a simple majority vote of the commission.
>
> (2) After introducing a proposed general assembly district plan under division (A)(1) of this section, the commission shall hold a public hearing concerning the proposed plan, at which the public may offer testimony and at which the commission may adopt amendments to the proposed plan. Members of the commission should attend the hearing; however, only a quorum of the members of the commission is required to conduct the hearing.
>
> (3) After the hearing described in division (A)(2) of this section is held, and not later than the fifteenth day of September of a year ending in the numeral one, the commission shall adopt a final general assembly district plan, either by the vote required to adopt a plan under division (B)(3) of Section 1 of this article or by a simple majority vote of the commission.

{¶ 182} Article XI, Section 8(A) establishes a new set of rules when the commission fails to meet the September 1 deadline: the commission must introduce a proposed plan by a simple majority vote, Section 8(A)(1), and must hold "a public hearing," Section 8(A)(2). The commission's deadline for meeting those requirements is September 15 of a year ending in the numeral one. Ohio Constitution, Article XI, Section 8(A)(3).

{¶ 183} Without, in my view, any constitutional authority to do so, the majority opinion in *League II* ordered the commission, under Article XI, Section

9(B), "to be reconstituted, to convene, and to draft and adopt an entirely new General Assembly–district plan that conforms with the Ohio Constitution," *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 67. Neither that order nor the language of Article XI, Section 1 required the commission to comply with the second paragraph of Section 1(C). The commission therefore did not need to "release" its proposal or hold three public hearings before adopting the second revised plan.

{¶ 184} I would overrule the *Bennett* petitioners' objection arguing that the second revised plan violates Article XI, Section 1(C), and I disagree with the majority opinion's using Section 1(C) as the basis for any support of its conclusions on the Article XI, Section 6 claims presented here.

### III. Remedies

*A. The Majority Opinion's Instructions*

{¶ 185} In invalidating the second revised plan, the majority opinion imposes new requirements for the commission to follow in adopting a fourth plan. First, the majority opinion requires that the commission retain an independent map drawer before drafting a new plan. Majority opinion at ¶ 30. Second, the majority opinion orders the commission, presumably along with this independent map drawer, to draft the plan in public and convene "frequent" meetings. *Id*. at ¶ 44.

{¶ 186} These requirements are unprecedented in Ohio. They cannot be found anywhere in the Constitution, nor were they demanded of the commission when its other plans were invalidated the first two times the parties appeared before this court. The imposition of these judicially created requirements is troubling. The majority opinion quotes no constitutional text to support this order. And if these requirements are so critical to the redistricting process, then why are they being imposed only now, more than two months after the decision in *League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, and after the commission has twice reconvened to adopt revised plans?

{¶ 187} Equally troubling are the timing requirements imposed in the majority opinion. This court previously directed the commission to adopt a new plan within ten days. *League I* at ¶ 137; *League II*, ___ Ohio St.3d ___, 2022-Ohio-

342, \_\_\_ N.E.3d \_\_\_, at ¶ 68. In light of the new requirements imposed by the majority opinion, it seems logical that the commission should have more time to complete its task. Yet it does not. The approach set forth in the majority opinion seems to ignore the practical realities facing not only the commission but also Ohioans, who are now confronted with great uncertainty regarding their upcoming elections.

{¶ 188} These unfortunate realities are a direct result of the approach taken by the majority opinion today and by the majority opinions in *League I* and *League II*. All of this could have been avoided had this court applied the language of Article XI, Section 8(C)(1)(a) of the Ohio Constitution as written, as I advocated in *League I*. *See League I* at ¶ 314 (Fischer, J., dissenting).

*B. Injunctive Relief*

{¶ 189} The majority opinion does not address the other remedies requested by the parties. In a sense, the approach set forth in the majority opinions in *League I*, \_\_\_ Ohio St.3d \_\_\_, 2022-Ohio-65, \_\_\_ N.E.3d \_\_\_, and *League II* has encouraged the parties to seek these additional and baseless forms of relief. Because the majority opinion's approach to these cases has not been properly grounded in the Ohio Constitution, one cannot necessarily fault the parties for asking this court to grant other remedies not grounded in the Constitution. Because these additional remedies must be addressed in some fashion to prevent further unconstitutional requests, I will proceed to explain why those remedies should not, and cannot, be granted.

{¶ 190} On February 26, 2022, respondent Secretary of State Frank LaRose issued a directive to all county boards of elections, instructing them on how to prepare for the May 3, 2022 primary election using the second revised plan. The directive states:

> [D]ecisions in ongoing litigation may render some or all of this Directive moot. In that event, my Office will issue additional instruction. As you know, the redistricting process has been the subject of much litigation. This Directive is not contrary to any

order of the Ohio Supreme Court, nor should it be construed as such. This new General Assembly district plan adopted by the Ohio Redistricting Commission was filed with my office and is presumed valid. If there is additional litigation over this new district plan, the outcome of that litigation will be that the new plan is either valid or invalid. Because of the severe time constraints under which we are operating to hold Ohio House and Ohio Senate primary races with the May 3, 2022 Primary Election, we must begin preparations for those elections immediately in the anticipation that the Court will uphold the new plan. Obviously, if a few weeks from now the Court rules that the new plan is invalid, it will not be possible to conduct Ohio House and Ohio Senate primary elections with the May 3, 2022 Primary Election.

> \* \* \*

[G]iven the incredibly unfortunate impact that redistricting litigation has had on the election calendar and our ability to administer an election in a manner that will inevitably lead to the best chances of success, all boards must immediately begin the process of reprogramming their voter registration systems with the February 24, 2022 General Assembly district maps.

(Footnote omitted.) Directive 2022-26, https://www.sos.state.oh.us/globalassets /elections/directives/2022/directive-2022-26.pdf, at 2-3 [https://perma.cc/439R-CLEG].

{¶ 191} Petitioners, along with Senator Sykes and House Minority Leader Russo, argue that this court should *enjoin* Secretary LaRose from making this directive, thereby preventing him from implementing the second revised plan. They further argue that this court should enjoin the implementation of any plan that remains subject to judicial review.

{¶ 192} Requests for injunctive relief are generally not within this court's original jurisdiction. *See State ex rel. Grendell v. Davidson*, 86 Ohio St.3d 629,

634-635, 716 N.E.2d 704 (1999). And petitioners have not shown that they are entitled to the injunctive relief they seek here.

{¶ 193} Significantly, there is nothing unlawful about Secretary LaRose's directive. It is true, as Secretary LaRose stated in his February 26, 2022 directive, that the second revised plan is presumptively valid. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 76-80. And as the state's chief elections officer, Secretary LaRose has a duty to instruct elections officials how to prepare for the May 3 primary election, which at this point will include General Assembly races. *See* R.C. 3501.05(B) ("The secretary of state shall * * * [i]ssue instructions by directives * * * to members of the boards [of elections] as to the proper methods of conducting elections"). Secretary LaRose acknowledged the extraordinary circumstances surrounding the upcoming primary, and he signaled that his instructions could change depending on this court's decision regarding petitioners' objections. Therefore, this court should not issue an injunction concerning Secretary LaRose's directive.

{¶ 194} Moreover, Secretary LaRose's directive might still be proper *even though this court is invalidating the second revised plan*. The second revised plan was adopted by a simple majority vote and is governed by Article XI, Section 8(C)(1)(a) of the Ohio Constitution, which provides:

> Except as otherwise provided in division (C)(1)(b) of this section, if the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state and *shall remain effective until two general elections* for the house of representatives have occurred under the plan.

(Emphasis added.)

{¶ 195} The statement that the plan "shall remain effective until two general elections for the house of representatives have occurred" is unqualified—it does not state that the plan shall cease to be in effect if this court declares it to be invalid under Article XI, Section 9. The absence of such a qualification in Section 8(C)(1)(a) is significant because that qualification does appear elsewhere in Section 8. *See* Article XI, Sections 8(B) and 8(C)(1)(b) (providing that under different circumstances than are presented here, plans shall remain effective until the next year ending in the numeral one "except as provided in Section 9 of this article"). Thus, the holding that the second revised plan is invalid does not render that plan ineffective. Accordingly, this court lacks any authority to enjoin Secretary LaRose from implementing the second revised plan (or any other plan adopted under Section 8(C)(1)(a)). *See League I* at ¶ 314 (Fischer, J., dissenting); *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 152 (Fischer, J., dissenting).

{¶ 196} Petitioners also argue that "this Court should not hesitate to use its authority to suspend or modify election-related deadlines until Ohioans are able to vote under constitutional maps." And they argue that this court should "direct the Secretary of State and General Assembly to make the required adjustments" to the primary-election deadlines. The only authority offered in support of these arguments is *Carter v. Chapman*, Pa. No. MM 2022, 2022 WL 549106 (Feb. 23, 2022), in which the Supreme Court of Pennsylvania modified deadlines for Pennsylvania's 2022 congressional primary election. But *Carter* does not point to any authority allowing this Ohio court to modify Ohio's primary-election date or schedule, especially considering that Ohio has a specific constitutional amendment that spells out this court's role in the General Assembly–redistricting process. Indeed, as this court specifically recognized in *League II* at ¶ 65-66, it is the province of the General Assembly to set the election date and election-related deadlines. *See* R.C. 3501.01(E)(1) and 3513.05. I would reject the requests for injunctive relief because petitioners fail to support their assertion that this court has any authority to change the election schedule or to direct Secretary LaRose or the General Assembly to do so.

*C. Validation of Alternative Plans*

{¶ 197} Senator Sykes and House Minority Leader Russo ask this court to violate Article XI of the Ohio Constitution and declare the Sykes-Russo plan constitutional. Similarly, petitioners seek a declaration that the Rodden III plan is constitutional. In fact, the petitioners in *Ohio Organizing Collaborative v. Ohio Redistricting Comm.* ("the OOC petitioners") ask this court to order the commission to "state whether it will adopt the Rodden [III] Plan, and if not, why it contends that the Rodden [III] Plan does not comply with the Ohio Constitution." The Bennett petitioners go further still, asking this court to adopt the Rodden III plan. All these requests, if granted, would be "extraconstitutional" and therefore would violate the Ohio Constitution.

{¶ 198} In its earlier decisions in these cases, the majority opinions cited previous plans prepared by Dr. Rodden as evidence that the commission, had it attempted to do so, could have adopted a district plan that allegedly came closer to complying with Article XI, Sections 6(A) and 6(B). *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 112-113, 126, 130; *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 23, fn. 6 and ¶ 32, 45, 47, 54. The majority opinions in *League I* and *League II* referred favorably to Dr. Rodden's previous plans, but those opinions never fully analyzed the constitutionality of his plans. At most, the previous majority opinions referred to Dr. Rodden's plans as evidence that the commission *could have* adopted a more proportional plan, supporting the inference that the commission either did not attempt to achieve proportionality to Ohio voters' statewide preferences or adopted plans with the primary intent of favoring the Republican Party. *See League I* at ¶ 113, 126; *League II* at ¶ 45.

{¶ 199} Article XI, Section 9(A) grants this court subject-matter jurisdiction in cases arising under Article XI. Section 9(B), in turn, contemplates that this court may determine the constitutional validity of a "general assembly district plan *made by the Ohio redistricting commission*." (Emphasis added.) Ohio Constitution, Article XI, Section 9(B). Nothing, absolutely nothing, in Article XI authorizes this court to address the validity of a district plan that the commission

has *not* adopted. This means that there is no actual controversy concerning any plan other than the second revised plan. Petitioners, along with Senator Sykes and House Minority Leader Russo, seek purely advisory opinions about the constitutionality of other plans. It is well settled that this court "will not indulge in advisory opinions." *State ex rel. White v. Kilbane Koch*, 96 Ohio St.3d 395, 2002-Ohio-4848, 775 N.E.2d 508, ¶ 18.

{¶ 200} The *Bennett* petitioners nevertheless ask that this court itself adopt a plan, asserting that "[c]ountless courts have done the same * * * even without express authority to do so under those courts' own state constitutions." To be sure, other state courts have adopted reapportionment plans, and the Supreme Court of the United States has recognized that state courts generally have the authority to do so in certain circumstances. *See Scott v. Germano*, 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965). But the Ohio Constitution clearly, expressly, and directly forbids this court from "order[ing], in any circumstance, the implementation or enforcement of any general assembly district plan *that has not been approved by the commission* in the manner prescribed by this article." (Emphasis added.) Article XI, Section 9(D)(1); *see also* Article XI, Section 9(D)(2) ("No court shall order the commission to adopt a particular general assembly district plan or to draw a particular district"). Contrary to the *Bennett* petitioners' argument, this court clearly lacks any authority to adopt a district plan or to require the commission to justify why it will not adopt a particular plan.

{¶ 201} The *Bennett* petitioners acknowledge that Article XI, Section 9(D) prohibits the relief they are seeking, but they argue that that provision "must bend in this moment." In fact, they suggest that this court should "sever" Section 9(D) under the authority of Article XI, Section 10, which provides that the "various provisions of [Article XI] are intended to be severable, and the invalidity of one or more of such provisions shall not affect the validity of the remaining provisions." But Section 10 does not authorize this court to simply disregard Section 9(D), particularly when no party has even alleged that Section 9(D) is unconstitutional. Moreover, the constitutional values set forth are there to make absolutely sure that Ohio's constitutional principles do not "bend."

{¶ 202} As a final matter, the *Bennett* petitioners argue that the separation-of-powers doctrine requires this court to disregard Article XI, Section 9(D) and to adopt an alternative plan. They attempt to invoke Article IV, Section 1 of the Ohio Constitution, which vests the "judicial power of the state" in Ohio's courts. But the separation-of-powers doctrine actually, and significantly, cuts the other way. Apportionment is a *legislative* task and is delegated to the commission. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 76, 79. The people of Ohio have given the judicial branch a very limited role when it comes to apportionment: This court's jurisdiction is limited to determining only whether commission-adopted plans are valid, Article XI, Sections 9(B) and 9(D), and only under certain circumstances not present here. *League I* at ¶ 300-301 (Fischer, J., dissenting); *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 152 (Fischer, J., dissenting). I would not adopt an alternative plan, because by doing so this court would unconstitutionally be exercising legislative—not judicial—power.

### D. Appointment of a Special Master

{¶ 203} Petitioners argue that this court should appoint a special master to "provid[e] guidance and assistance to the Commission to aid it in drawing a constitutional plan." They suggest that a special master could draft a plan as a starting point and that the commission could be required to justify any changes to that plan. And they suggest that a special master could "provide minute-by-minute feedback on a plan drawn collectively by the Commission in public view, instead of evaluating maps after their passage." Senator Sykes and House Minority Leader Russo also ask this court to appoint a special master, arguing that we could authorize a special master "to employ one or more experts" and "prepare a constitutional plan."

{¶ 204} Ohio's Constitution does not permit such a thing. Petitioners and the minority-party commission members have not shown that this court could lawfully appoint a special master to carry out these duties. Any special master would be an officer of this court, acting on our behalf. *See Black's Law Dictionary* 1168 (11th Ed.2019) (defining "special master" as a "parajudicial officer" who is "appointed to assist the court with a particular matter or case"). Because this court

itself lacks constitutional authority to actively participate in the drafting of a district plan, it may not appoint a special master to do so. *See* Ohio Constitution, Article XI, Section 9(D)(2) ("No court shall order the commission to adopt a particular general assembly district plan or to draw a particular district"). And, as discussed above, this court may review *commission-adopted* district plans only under certain circumstances. *See id.* at Sections 9(B) and (D)(1). Because this court lacks any authority to determine the validity of a plan before it is passed, I would not appoint a special master for that purpose.

### E. Declaration of an Impasse

{¶ 205} The *OOC* petitioners argue that as a last resort, this court should "declare an impasse, after which a federal court will provide federal remedies." *See Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (recognizing that a federal court may become involved in reapportionment if there is evidence that the appropriate state entity "will fail timely to perform" its duty to reapportion). Article XI, Section 9 refers only to this court's authority to consider the validity of a district plan; it does not authorize us to declare that the commission is incapable of performing its constitutional duty in a timely manner. Clearly, there is no basis in law or fact for this request.

### F. Contempt

{¶ 206} The *Bennett* petitioners argue that this court should hold respondents in contempt until they adopt a plan that we declare to be constitutional. The *OOC* petitioners similarly note that "there is still time for this Court to schedule a contempt hearing to determine the appropriate remedy for the Commission's refusal to adopt a constitutional plan."

{¶ 207} Contempt proceedings are "special proceeding[s]." *In re Contempt of Common Pleas Court*, 30 Ohio St.2d 182, 187, 283 N.E.2d 126 (1972), *overruled on other grounds*, *State ex rel. Edwards v. Murray*, 48 Ohio St.2d 303, 305, 358 N.E.2d 577 (1976). They are "sui generis in the law. They bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions; but they are none of these." *Cincinnati v. Cincinnati Dist. Council 51, Am. Fedn. of State, Cty., and Mun. Emps., AFL-CIO*, 35 Ohio St.2d 197, 201-202, 299 N.E.2d 686 (1973).

Any proceedings to hold respondents in contempt, therefore, are distinct from this court's consideration of petitioners' objections in these original actions. *See Hansen v. Hansen*, 132 Ohio App.3d 795, 799, 726 N.E.2d 557 (1st Dist.1999), fn. 5, citing 17 Corpus Juris Secundum, Contempt, Section 62(6), at 159-160 (1963).

{¶ 208} To avoid conflating its consideration of petitioners' objections with the separate contempt proceedings, this court must defer on deciding the contempt issues at this time.

## G. Attorney Fees

{¶ 209} The *Bennett* petitioners argue that this court should award them attorney fees. They first refer to R.C. 2323.51, which authorizes an award of attorney fees when a party has engaged in "frivolous conduct" as defined in R.C. 2323.51(A)(2). They forget that to award attorney fees under that statute, a court must schedule a hearing, R.C. 2323.51(B)(2)(a), give notice of the hearing, R.C. 2323.51(B)(2)(b), and allow the parties to present evidence, R.C. 2323.51(B)(2)(c). Considering the significant time constraints that exist, this court should not act under R.C. 2323.51, because the commission's actions have not been found frivolous.

{¶ 210} The *Bennett* petitioners also argue that this court should award attorney fees based on "a determination that Respondents acted in bad faith." "In Ohio, the general rule is that absent a statute allowing attorney fees as costs, the prevailing party is not entitled to an award of attorney fees unless the party against whom the fees are taxed acted in bad faith." *State ex rel. Maloney v. Sherlock*, 100 Ohio St.3d 77, 2003-Ohio-5058, 796 N.E.2d 897, ¶ 55. "Bad faith" connotes "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, 187 N.E.2d 45 (1962), paragraph two of the syllabus, *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), paragraph one of the syllabus. Because this type of inquiry would significantly overlap with what this court eventually may consider in

contempt proceedings or when considering an attorney-fee request under R.C. 2323.51, we must defer any decision on respondents' alleged bad faith, if any.

## IV. Conclusion

{¶ 211} The majority opinion constitutes yet another assertion of authority that this court has not been given under Article XI of the Ohio Constitution. *See League I*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, at ¶ 279 (Fischer, J., dissenting); *League II*, ___ Ohio St.3d ___, 2022-Ohio-342, ___ N.E.3d ___, at ¶ 149 (Fischer, J., dissenting). However, even being forced to look past that troubling constitutional and procedural issue to review the substance of the arguments now before this court, it is clear that petitioners once again have not carried their burden of proof to support their argument that the second revised plan is unconstitutional. Further, petitioners' other requests are without any real basis in fact, and most are without any basis in Ohio law.

{¶ 212} For these reasons, I must respectfully dissent and would overrule the objections.

_____

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, Joshua González, Juliana Goldrosen, David Denuyl, Alexander Thomson, Anupam Sharma, and Yale Fu, for petitioners in case No. 2021-1193.

McTigue, Colombo & Clinger, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Jyoti Jasrasaria, and Spencer W. Klein, for petitioners in case No. 2021-1198.

Reed Smith, L.L.P., Peter M. Ellis, M. Patrick Yingling, Brian A. Sutherland, Ben R. Fliegel, Brad A. Funari, and Danielle L. Stewart; and Brennan Center for Justice at New York University School of Law, Alicia L. Bannon, Yurij Rudensky, Michael Li, Harry Black, and Ethan Herenstein, for petitioners in case No. 2021-1210.

Dave Yost, Attorney General, and Organ Law, L.L.P., Erik J. Clark, and Ashley T. Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Dave Yost, Attorney General, and Zeiger, Tigges & Little, L.L.P., John W. Zeiger, Marion H. Little Jr., and Christopher J. Hogan, special counsel to Attorney General Dave Yost, for respondent Ohio Governor Mike DeWine.

Dave Yost, Attorney General, and Bridget C. Coontz, Julie M. Pfeiffer, and Michael A. Walton, Assistant Attorneys General, and Michael J. Hendershot, Deputy Solicitor, for respondent Ohio Secretary of State Frank LaRose.

Taft, Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson; and Nelson Mullins Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins, for respondents Senate President Matt Huffman and Speaker of the House Robert Cupp.

Cooper & Elliott, L.L.C., C. Benjamin Cooper, Charles H. Cooper Jr., and Chelsea C. Weaver, for respondents Senator Vernon Sykes and House Minority Leader Allison Russo.

————————————